**ESTATE OF Grace A. DETWILER, Grace A. Detwiler Trust for George A. Detwiler and his Family, Grace A Detwiler Trust for Peter M. Detwiler and his Family, Grace A. Detwiler Trust for Frederic B. Detwiler and his Family, Grace A. Detwiler Trust for Children of Frederic B. Detwiler, Grace A. Detwiler Trust for Phyllis S. Detwiler and Her Family, George A. Detwiler Trust, the Estate of George A. Detwiler, Peter M. Detwiler, Frederic B. Detwiler, Phyllis D. Henderson, Helen S. Bryant Trust, John A. Bryant, II and William R. Bryant, Jr., Plaintiffs,**

v.

**Dale J. OFFENBECHER, John B. Davies and Sidney W. Smith, Jr., Defendants.**

No. 86 Civ. 7150 (RWS).

United States District Court, S.D. New York.

Aug. 16, 1989.

See also 124 F.R.D. 545.

**108**

Cadwalader, Wickersham & Taft (Harvey M. Spear, Richard H. Walker, Robert Knuts and Jane K. Rushton, of counsel), New York City, for plaintiffs.

Olwine, Connelly, Chase, O'Donnell & Weyher (John Logan O'Donnell, Grace M. Healy and Lisa M. Hughes, of counsel), New York City, Foley & Lardner (Maurice J. McSweeney, of counsel), Milwaukee, Wis., and Davis Markel & Edwards (Thomas Manick, of counsel), New York City, for defendants.

OPINION

SWEET, District Judge.

Defendants Dale J. Offenbecher ("Offenbecher"), John B. Davies ("Davies"), and Sidney W. Smith, Jr. ("Smith") (collectively, the "Defendants") have moved pursuant to Rule 56, Fed.R.Civ.P., for an order dismissing the amended complaint of plaintiffs Estate of Grace A. Detwiler, *et al.* (collectively, the "Plaintiffs"). For the reasons set forth below, the motion is granted, and the amended complaint is dismissed.

By virtue of the skill of counsel for both sides—as well as their care and diligence—a thorough and professional autopsy of a complicated corporate transaction has been presented for diagnosis. This dispute has been driven by the differing views of well advised, ably represented shareholders and executives of a closely held corporation as to the proper course of the corporation's affairs. Despite the inherent complications surrounding an almost $100 million transaction, these factors have made this motion a case study in the propriety of pretrial resolution.

*The Parties and Players*

Ferro Manufacturing Corporation ("Ferro" or "the Company") was a closely held Michigan corporation with its principal place of business in Detroit, Michigan. Since the early 1980s, Ferro had been organized as a corporate holding company that owned three businesses, each operating independent of one another, with a separate President, Vice President of Finance or Controller, and other officers.

The Automotive Division ("Automotive") manufactured equipment for cars and trucks. Automotive included Ferro Plastics Products, Inc. ("Plastics"), which produced custom injection molded plastic products for Automotive and automotive original equipment manufacturers. In 1978, Ferro acquired the Von Weise Gear Company ("VWG"), which manufactured fractional horsepower gear motors for industrial and other applications. Ferro acquired the Aerospace Division ("Aerospace") in 1983. That division was comprised of two subsidiaries, Gentz Industries, Inc. ("Gentz") and

Johnson Technology, Inc. ("JT"), that manufactured commercial and military aircraft parts.

For the fiscal year ended August 31, 1984, Ferro earned $11,698,000 on net sales of $195,200,000—$134,800,000 for Automotive, $37,800,000 for VWG, and $22,600,000 for Aerospace. In 1980, the Company had sales of $69 million.

During 1984 and 1985, various individuals and trusts owned Ferro's stock, distributed among Ferro's management and descendants of the Company's four founding families in the following proportions:

| Family | Number | Percent |
| --- | --- | --- |
| Rollo W. Detwiler | 184,356 | 16.4% |
| William C. Devereaux | 747,840 | 42.5% |
| Ward A. Detwiler | 193,920 | 17.3% |
| John A. Bryant | 206,856 | 18.4% |
| Management | 60,000 | 5.3% |

The Plaintiffs are members of the Ward A. Detwiler and John A. Bryant families and trusts benefitting members of those families. The parties connected to the Ward A. Detwiler family include Estate of Grace A. Detwiler, Grace A. Detwiler Trust for George A. Detwiler and his family, Grace A. Detwiler Trust for Peter M. Detwiler and his family, Grace A. Detwiler Trust for Frederic B. Detwiler and his family, Grace A. Detwiler Trust for Children of Frederic B. Detwiler, Grace A. Detwiler Trust for Phyllis S. Detwiler and her family, George A. Detwiler Trust, Estate of George A. Detwiler, Peter M. Detwiler, Frederic B. Detwiler, and Phyllis D. Henderson. The parties connected to the John A. Bryant family include the Helen S. Bryant Trust, John A. Bryant, II, and William R. Bryant, Jr.

Ferro had a nine-person board of directors. The four representatives of the founding families included Warren F. (a/k/a Rick) Kendall ("Kendall"), grandson of William C. Devereaux and Vice President Manufacturing of Automotive; Philip B. Detwiler ("Philip Detwiler"), son of Rollo W. Detwiler and a retired senior construction engineer; plaintiff Peter M. Detwiler ("Peter Detwiler"), son of Ward A. Detwiler and Vice–Chairman of the board of E.F. Hutton & Co., Inc. ("Hutton"); and plaintiff John A. Bryant III ("Bryant"), grandson of John A. Bryant and a manufacturer's representative.

The Company's three outside directors included Richard E. Fister ("Fister"), who was President of Fister and Associates, a management consulting firm, and who had served as Professor of Finance at St. Louis University, director of a number of companies, and Chief Executive Officer of VWG before Ferro acquired it; William R. James ("James"), who was Vice President of Capital Cities Communications, Inc. and had served as a Touche Ross & Co. ("Touche Ross") partner in charge of the firm's national manufacturing consulting practice, and who held a Masters in Business Administration from Harvard University; and Paul S. Mirabito ("Mirabito"), a retired Chairman and Chief Executive Officer of Burroughs Corporation who served as director of various companies, including Unisys, Bendix, Warner Lambert, Consumers Power, and Detroit Bank & Trust. None of the three outside directors held Ferro shares or participated in management.

The management representative on the board was defendant Dale J. Offenbecher ("Offenbecher"), who served as Ferro's Chairman, President, and Chief Executive Officer and owned 3.2% of its voting shares.

Defendant Sidney W. Smith, Jr. ("Smith"), a senior partner in the Detroit law firm of Clark, Klein & Beaumont ("Clark Klein"), served as legal counsel on the board. Smith and his firm had been Ferro's general counsel since the Company's inception. Smith also represented Adelyn and Leslie Devereaux on the board and served as legal counsel to members of the Devereaux, Kendall, and Rollo Detwiler families and as legal counsel and/or co-trustee of several trusts holding Ferro stock.

In addition to Offenbecher, Ferro's senior management included defendant John B. Davis, Jr. ("Davies"), the Company's Senior Vice President for Finance and Administration, Secretary, and Treasurer, who owned approximately one percent of Ferro's shares. Offenbecher and Davies

ran the Ferro holding company, without primary operational responsibilities for any of its three businesses.

James E. Stewart ("Stewart") was President of Automotive, and he owned approximately one percent of Ferro's shares. James E. Grimes ("Grimes") served as President of Aerospace, and Edward M. Kruske ("Kruske") was President of VWG. Neither Grimes nor Kruske owned any Ferro shares.

Ferro's investment banker was Dillon, Read & Company, Inc. ("Dillon Read"), a firm experienced in the mergers and acquisitions field. In 1985, for example, the firm acted as investment advisor to the purchaser or seller in over thirty transactions. The twenty-one transactions in which price information was disclosed amounted to $10.6 billion.

Significantly, the transaction the Plaintiffs challenge in this lawsuit did not involve a publicly-held company with widely-dispersed shareholders having varying degrees of sophistication and knowledge about the company. Ferro's shareholders included a small number of sophisticated individuals and trusts whose extensive involvement with the company provided them substantial knowledge about its products, operations, and financial structure.

*Prior Proceedings*

A majority of Ferro's shareholders voted on July 25, 1985 to sell the Company to Hoover Universal, Inc. ("Hoover") for $87.59 per share. The Plaintiffs include the shareholders in the minority who voted against the sale.

On September 17, 1986, the Plaintiffs filed a complaint against Offenbecher, Davies, and Smith, alleging violations of Rule 10b–5 and breaches of fiduciary duties arising out of the events surrounding the sale. They filed an amended complaint on January 10, 1989.

The parties have conducted extensive discovery during the course of this action. More than eighty deposition notices or subpoenas for parties, non-parties, and experts have been issued, and thousands of pages of documents have been produced.

On January 13, 1989, the Defendants moved pursuant to Rule 56, Fed.R.Civ.P., to dismiss the amended complaint in its entirety. Oral argument was held and the motion was considered fully submitted on March 24, 1989.

*Findings of Fact* [1]

A. Early Efforts to Sell Ferro

On June 28, 1977, Ferro's board voted unanimously to investigate a possible merger or sale of Ferro. Toward this end, the Company interviewed several investment banking firms, including Hutton, and retained Dillon Read on November 23, 1977. Dillon Read advised Ferro regarding a possible sale or merger in 1977 and performed services for Ferro in connection with the acquisition of VWG in 1978.

After Warren F. Kendall, Sr. died and W. Robert Bryant became terminally ill in 1978, both of whom had been directors favoring the merger or sale, Ferro discontinued its efforts to find a buyer for the Company. At that time, Mrs. Shirley D. Kendall determined that she would not vote in favor of a sale as long as the Ward Detwiler family opposed it. When Shirley Kendall died on October 6, 1983, her children inherited her stock, and they did not share her opposition to the sale of Ferro.

B. Management's Initial Approach to Dillon Read in 1983

In December 1983, Offenbecher telephoned Dillon Read to arrange a meeting to discuss a possible sale of Ferro. Offenbecher met with Dillon Read on January 6, 1984, and on January 9, 1984, Offenbecher sent Dillon Read financial information relating to Ferro. An internal Dillon Read memorandum dated January 11, 1984 set forth the results of its meeting with Offenbecher as follows:

---

1. These findings of fact draw upon the Defendants' Statement of Undisputed Facts Pursuant to Local Rule 3(g), the Plaintiffs' Counterstatement of Disputed Facts Pursuant to Local Rule 3(g), the Defendants' Combined Statement of Facts, eleven volumes of exhibits, and numerous affidavits.

The desire of certain stockholders to sell and the advanced age of other stockholders has created a potentially unstable situation from management's point of view. As a result, we have been asked to evaluate the following alternatives:

1. Management buy-out of the Company.

2. Sale of the Company to a third party.

3. Initial public offering, including secondary shares.

Please note that the situation is very sensitive, as the Company's Board of Directors is not yet aware that discussions with Dillon Read are taking place.

At his deposition, Offenbecher testified that he did not recall whether he told any member of Ferro's board that he had met with Dillon Read to discuss alternatives for selling the Company.

On January 19, 1984, Offenbecher and Davies met with Dillon Read representatives. At that meeting, Dillon Read distributed a report concerning Ferro (the "January Report"). That report summarized Ferro's recent financial results, identified companies similar to Ferro to determine Ferro's value, analyzed how to arrange a management leveraged buy-out ("LBO"), and tabulated the financial results of recent initial public offerings ("IPOs") and mergers.

On January 25, 1984, Davies forwarded additional financial information to Dillon Read. From mid-January through mid-February 1984, Dillon Read prepared various analyses identifying prospective purchasers and examining a possible LBO of Ferro.

On February 14, 1984, Offenbecher, Davies, and Smith met with Dillon Read representatives. Dillon Read distributed a report (the "February Report") analyzing each of Ferro's divisions and discussing four alternative transactions regarding Ferro: the sale of the Company to a third party, a management buyout of the Company, the sale of Automotive, and a public offering of shares.

## C. The Directors' Involvement in the Decision to Sell Ferro

On January 23, 1984, Davies sent Ferro's directors a letter notifying them of a special board meeting scheduled for February 29, 1984 regarding "Corporation Philosophy and Actions to Implement." The letter added: "Since this is a very important topic, you should plan to be available for the entire business day."

As scheduled, the Ferro board met on February 29, 1984. According to the board minutes, the board had a lengthy discussion, and then a motion was made to retain an independent investment banker "to review and make recommendations as to the future directions available to the Company and its shareholders in realizing the value of their equity interests." When Peter Detwiler questioned the legality of this resolution, the board resolved to retain independent counsel to determine the resolution's legality. According to Peter Detwiler, he sought permission to bring his lawyer into the meeting and into future board meetings, but Offenbecher stated that he thought this was improper. The minutes of the February 29, 1984 board meeting contain no indication that Offenbecher, Davies, or Smith disclosed their ongoing contacts with Dillon Read or the fact that Dillon Read had prepared two reports regarding Ferro.

On March 1, 1984, Philip Detwiler sent Smith a letter discussing the February 29, 1984 meeting. In that letter, he stated, among other things:

I wish to commend you for your calm response to Peter's remarks. His personal attack on you was out of order and I was close to assailing him (verbally). I will not let it pass a second time.

I don't see how there could be any legal objection to the motion you made but perhaps there could be some improvement in its wording with a little more time to think about it. I found it hard to reason clearly with the pressure but thought you performed admirably. It's just a stalling effort by Peter to deter us. I have lost *all* respect for Paul Mirabito. His defense of Peter's position in my

mind is not through a reasonable thought process. I am beginning to feel we could do without him as a board member for several reasons.

I rode to the airport with Dick Fister and our talk reinforced my favorable opinion of him and his logic. He told my about his background and it seems his experience makes him a very valuable member of the board. I am sure he is 100% his own man. He thinks Peter's questioning the legality is ridiculous but would probably like to see some compromise made. I had the unforeseen pleasure to ride to Chicago with Dale in side by side seats.... He has no doubt about my confidence or support of him. He dislikes Peter's tactics as much as we do.... We really had a great talk and I consider it invaluable to me. I also consider him invaluable.

Well, round # 1 is over. You warned me it would not be an easy or always a pleasant job to be on the Board. I found out rather promptly. But I am not discouraged and have already started training for round # 2. See you in about 2½ weeks.

In early March 1984, Offenbecher and Davies retained the Detroit law firm of Dickinson, Wright, Moon, Van Dusen & Freeman ("Dickinson Wright") to prepare and deliver "some opinions." Offenbecher and Davies told Dickinson Wright that Peter Detwiler had asserted a right to have his counsel present at board meetings, and they sought an opinion from the firm whether directors had this right under Michigan law. Notes from that meeting indicate that Offenbecher and Davies told the firm that Smith represented the Devereaux, Kendall, and Philip Detwiler families on the board.

On March 14, 1984, Dillon Read prepared a fee approval form regarding Ferro that described its engagement as to prepare a presentation for the May board meeting discussing "what the company could expect in a sale, a public offering and what the impact on shareholders would be of the alternatives compared to remaining a private company." The form noted that "a substantial amount of work has already been performed on this presentation." At the time Dillon Read prepared this form, the board had not decided formally to hire Dillon Read or any other investment banking firm.

Ferro's board met on March 20, 1984. At that meeting, the board appointed a special committee of its outside directors—Fister, James, and Mirabito—"to investigate the interests of the Company's stockholders concerning their ownership in the Company and the needs of the Company." The board authorized the committee "to employ independent investment bankers, special counsel, and such other experts as the Committee deemed necessary." Peter Detwiler and Bryant aver that they did not know that the Special Committee's purpose was to arrange Ferro's sale when they voted in favor of this resolution.

At the time of the March 20, 1984 meeting, Offenbecher intended to recommend Dillon Read to the board because the firm had previous knowledge of the Company, management, and stockholders, it had performed due diligence for VWG, and Offenbecher believed the board and management could work effectively with Dillon Read. Offenbecher did not recommend Dillon Read to the board, however, because the board resolved to appoint a special committee. Offenbecher and Davies did not inform the board that they had met with Dillon Read in January and February 1984 and that Dillon Read had prepared two reports about Ferro.

During a recess in the board meeting, Offenbecher recommended Dillon Read to Fister and James, two of the outside directors who were to serve on the special committee. The special committee later voted to retain Dillon Read as its investment banker. In his affidavit, James stated:

> At the time the committee retained Dillon Read, I knew that Dillon Read had been in contact with Dale Offenbecher earlier that year regarding the same or similar subjects as to which the committee sought their advice and was aware that Dillon Read had performed work in

that regard in consultation with Dale Offenbecher. Dillon Read's prior work in 1984, as well as Dillon Read's prior work for Ferro in the 1977–78 time frame, were positive factors in my determination to recommend Dillon Read be retained by the committee. As a result of my contemporaneous discussions with the other members of the committee and Dillon Read, the other committee members were also aware of the foregoing facts at the time we determined to retain Dillon Read.

Fister testified at his deposition that he knew that Dillon Read had worked for Ferro in 1977 and that Offenbecher had kept the firm up to date about the Company since then. He did not recall whether Offenbecher told him the services Dillon Read had performed in this connection. At his deposition, Mirabito testified that he did not recall whether Dillon Read disclosed to the committee that it previously had performed services for Ferro's management.

The special committee also retained Fred W. Freeman ("Freeman") of Dickinson Wright.

On April 6, 1984, the special committee met with Dillon Read representatives and Offenbecher to discuss the services the committee wanted Dillon Read to perform for it. Dillon Read presented a report (the "April Report") to a meeting of the special committee on April 25, 1984. Offenbecher also was present at that meeting. The report analyzed three options available to the shareholders: maintaining the status quo, selling the Company (either to a third party or in an LBO), or making an IPO.

Dillon Read's analysis of a third party sale assessed a range of values for each of Ferro's three divisions based upon the price/earnings ratios achieved in acquisitions of comparable companies. Its analysis of an LBO involved a discounted cash flow valuation model based on optimistic and pessimistic ten-year scenarios. Dillon Read assessed the IPO by looking at the implied market value for each of Ferro's three divisions based upon price/earnings ratios of comparable publicly traded companies.

The April Report omitted information contained in the January and February Reports, including an analysis of the "Acquisition Premium Over Target's Market Price 4 Weeks Prior to Announcement" for acquiring comparable manufacturing companies (the January Report), an analysis of the option of selling Automotive alone (the February Report), and a conclusion that Ferro's value in an IPO exceeded its value in a straight sale (the February Report).

On May 9, 1984, the special committee met with Offenbecher, Freeman, and Dillon Read representatives to review further the April Report and to discuss the meetings the special committee had conducted with various shareholders.

The Ferro board held a meeting on May 14, 1984, at which James advised the board about the special committee's progress in conducting shareholder interviews. Also at that meeting, Dillon Read representatives presented a summary of the April Report (the "Summary"). The Summary discussed six problems with maintaining the status quo, then reviewed the advantages and disadvantages of selling the Company to a corporate buyer, selling it in an LBO, or offering the shares to the public. It described the timing for a sale to a corporate buyer as "excellent," and it valued a sale to a corporate buyer at $58 to $67 million, an LBO at $60 million, and an IPO at $54 to $63 million. These valuations differed from the January Report's conclusion that valued the Company higher in an IPO than a sale.

Shortly after the May 14, 1984 board meeting, Peter Detwiler, through his attorney, Alan Schwartz ("Schwartz"), asked Freeman for a copy of Dillon Read's April Report. Freeman advised Schwartz that the special committee had restricted distribution of the report, but that Schwartz was free to view the April Report at Freeman's office. James, the special committee's chairman, subsequently authorized Freeman to deliver a copy of the April Report to Peter Detwiler. On June 13, 1984, Freeman sent Schwartz the report, asking him to forward it to Peter Detwiler.

### D. The Management Equity Plan

At the same time the Ferro board was considering a sale of the Company, it reviewed the Company's Management Equity Plan (the "Equity Plan"). Pursuant to the Equity Plan, Offenbecher had acquired 12,000 Ferro shares, Davies 4,000 shares, and Stewart 4,000 shares as of September 1, 1980, subject to certain restrictions. These included no full ownership rights unless they remained Ferro officers until 1987 and Ferro achieved stated financial results for fiscal year ("FY") 1981 through FY 1987. A three-to-one stock split in 1983 increased Offenbecher's holdings to 36,000 shares, Davies's to 12,000 shares, and Stewart's to 12,000 shares.

On February 20, 1984, Ferro's Compensation Committee, consisting of the Company's three outside directors, met. At Offenbecher's request, Touche Ross made a presentation concerning the possible tax consequences of the Equity Plan and the actions available to the Company to alleviate these consequences. One of the alternatives discussed involved paying management a bonus to cover taxes they would incur when restrictions on their stock lapsed. Offenbecher had discussed that alternative with Touche Ross prior to the February 20, 1984 meeting.

The committee directed Mirabito, its chairman, to prepare a report for the full board, and it requested Touche Ross to analyze the Equity Plan between Ferro and Offenbecher, Davies, and Stewart as it then was constituted. Touche Ross concluded that Ferro would have to pay bonuses totaling $891,682, including $535,010 for Offenbecher and $178,336 each for Davies and Stewart to eliminate the tax consequences to management resulting from removing the restrictions on their stock.

Touche Ross's report on the Equity Plan was presented to the Ferro board at a meeting on March 20, 1984.[2] Mirabito rec-ommended that the board adopt the bonus proposal contained in that report. At Peter Detwiler's request, the board agreed to involve Jack B. Salwen ("Salwen"), the attorney who prepared the Equity Plan in 1981. With Offenbecher abstaining[3], the board passed a resolution directing Mirabito to contact Salwen to review Touche Ross's report.

In late March and early April 1984, Salwen reviewed the Touche Ross report. In a memorandum dated April 19, 1984, Salwen recommended that the Compensation Committee reject the proposed bonus, reasoning that a bonus would cost Ferro almost $1 million more than Touche Ross had estimated.

At its May 14, 1984, the Ferro board revised the Equity Plan in the following respects: (1) all restrictions on stock owned by management would be eliminated as of November 7, 1983; (2) Ferro would loan Offenbecher $250,000 and Davies and Stewart $83,000 each to help them pay income taxes resulting from the lapse of the restrictions; (3) Ferro would provide Offenbecher, Davies, and Stewart additional bonuses to back these loans; and (4) if Ferro were sold, the Company would pay bonuses to Offenbecher, Davies, and Stewart in amounts equal to these loans plus additional taxes.

### E. Shareholders' Involvement in the Decision to Sell Ferro

Throughout 1984, the special committee met with representatives of the various shareholder groups, including Warren Kendall and Lynne Devereaux on April 6, 1984, two Bryants and three members of the Duffield family on April 16, 1984, Peter Detwiler, his attorney, Schwartz, and other members of the Ward A. Detwiler family on May 9, 1984, Philip Detwiler as spokesperson for the Rollo Detwiler family on May 14, 1984, John Bryant on September

---

2. At his deposition, Offenbecher testified that Mirabito presented the report to the board. In his affidavit, Peter Detwiler stated that Offenbecher distributed the report.

3. In his affidavit, Peter Detwiler stated that he objected to Offenbecher and Davies being present while the board considered their compensation plan and that the board asked them to leave the room. The minutes to the meeting note that Offenbecher abstained from voting, but include no reference to Offenbecher or Davies leaving the room.

28, 1984, and a representative of the National Bank of Detroit, as trustee for certain Devereaux and Rollo Detwiler family trusts, on October 9, 1984. The special committee set forth its findings in a report dated November 1984 (the "November Report").

Apart from contacts with the special committee, some of the shareholders discussed the available options among themselves in the summer of 1984. For example, Philip Detwiler contacted members of his family to solicit their views. Similarly, Warren Kendall met with James D. Kendall, Patricia Boyd, William Kendall, Adelyn Devereaux, and Leslie Devereaux regarding their opinion about selling the Company. Peter Detwiler discussed a possible sale with representatives from the National Bank of Detroit, as trustees of certain Rollo Detwiler and Devereaux trusts.

Some shareholders also met with management, Smith, and/or Dillon Read. In August, 1984, the Kendall and Devereaux families met with a Dillon Read representative, Offenbecher, and Smith. According to an agenda prepared for that meeting, Dillon Read described Ferro's present and future value, the type of transaction (including a sale of the entire business or a sale of Automotive), the potential purchasers (including a company listed on the New York Stock Exchange, a closely held company, an LBO, and a public offering), the role dissenting shareholders might play, and Dillon Read's recommendations. Offenbecher reviewed the Company's background, financial information, management and board of directors, and prospects. Smith discussed various tax effects, legal matters (regarding a sale of the Company, a spin-off, a sale of Automotive, and the shareholders' liability), and estate planning. When Ferro's board met on September 18, 1984, neither Offenbecher, Davies, nor Smith disclosed that they had met with Dillon Read and the Kendall and Devereaux families to discuss a possible sale of Ferro.

Philip Detwiler met with Kendall and Smith in the Fall of 1984 to discuss the sale of Ferro. Philip Detwiler testified that "we discussed how the votes might go, what people would be in favor and what people would not be and the process of how we could get ... it on the agenda for the directors to take action on getting a financial firm to study it and to find possible buyers."

At his deposition, Kendall testified that he also had several discussions with Offenbecher and Smith in October 1984 regarding "how to proceed with getting something in front of the Board to see if we could move the process along or possibly getting an offer for the company."

On October 31, 1984, Smith met with Jonathan Walton ("Walton"), the head of the Trust Department at the Detroit National Bank. Handwritten notes Walton made shortly after that meeting state:

> [Smith] still believes need for liquidity overrides all other considerations and Board should proceed with sale. [Smith] can count on about sixty-four percent of stock including [National Bank of Detroit] to support a sale. Peter [Detwiler] will oppose, delay, obstruct.... We will set up meeting with Phil[ip] Detwiler....

Smith's diary entries for early September through mid-November 1984 reveal that he met at various times with Kendall, Philip Detwiler, Offenbecher, Dillon Read, Freeman, and others. The entries do not indicate the substance of those meetings, however.

On November 6, 1984, Smith sent Kendall a resolution to introduce at the Ferro board meeting scheduled for November 13, 1984. The resolution provided:

> RESOLVED, that the notice of the Annual Meeting of the Shareholders of Ferro include as part of the agenda the following:
>
>> To consider options for the future course of the Company including its possible sale or merger.

In his letter, Smith told Kendall: "This resolution should be presented to the Board following the report of the special committee created for the purpose of determining the needs of the corporation and the wishes of the shareholders."

The Ferro board held a meeting on November 13, 1984 at which James presented the results of the special committee's discussions with shareholders. He stated that three families wanted to sell the Company, one did not, and one was split. At Peter Detwiler's request, the board minutes did not refer to the November Report. The board determined that the November Report would be given to Ferro's shareholders directly. By letter dated November 16, 1984, the special committee circulated the November Report to all directors.

Kendall decided not to introduce the resolution regarding the shareholders' Annual Meeting at the November 13, 1984 board meeting. The night before, Kendall had discussed the situation with Philip Detwiler, who left him with the impression that the Detwiler family was not sufficiently committed to a sale to go through the "stress and turmoil" Kendall knew it would create.

After the November 13, 1984 board meeting, Smith wrote Philip Detwiler, noting Kendall's decision not to place a sale or merger on the agenda for the shareholders' Annual Meeting and asking Philip Detwiler to "review this very carefully with members of your family to reaffirm their desire to sell the stock or understand that they will not give this assurance." Philip Detwiler replied to Smith on November 19, 1984. He expressed frustration at the request, stating:

This whole matter of reviewing my family's position is a delay that was quite uncalled for in my opinion. I do not think, nor have I ever thought, there is any likelihood any of us will reverse our position. If I had such doubts I would have made them known. When I advised my niece there were doubts as to her position ..., her indignant reply was "Do they want it in blood?' I feel a little the same way.

* * * * * *

I will say it again. Peter [Detwiler] may be right. That's an honest admission.... But only a few years down the road will provide the answer and we've chosen before to think otherwise.

Smith's diary entries for late November and early December 1984 indicate that Smith met at various times during that period with Offenbecher, Kendall, Smith, Crenshaw, Leslie Devereaux, Philip Detwiler, and Adelyn Devereaux. The entries contain no indication of the substance of those meetings.

F. The Shareholders' Annual Meeting

Ferro held its shareholders' Annual Meeting on December 11, 1984 (the "Shareholders' Meeting"). In preparation, Smith drafted a script for the Shareholders' Meeting that he sent to Offenbecher on November 30, 1984. The script called for Kendall to introduce a motion regarding the sale or merger of Ferro and for Philip Detwiler to second the motion.

The day before the meeting, Offenbecher and Smith met with Kendall, Philip Detwiler, and four members of Philip Detwiler's family. Offenbecher testified at his deposition that the meeting's purpose was to "get a feeling for the degree of resolve that that family had in possibly pursuing the options that were available to them," particularly regarding the sale of the Company.

At the Shareholders' Meeting, Warren Kendall presented, and Philip Detwiler seconded, the following resolution:

RESOLVED, that the Board of Directors is requested and urged to authorize the President of the Company to negotiate an agreement for a transaction which would result in a favorable sale of the stock of the Company or merger of the Company, which agreement shall be subject to the approval of the Board of Directors and the stockholders. The Board is further requested to employ the services of an investment banker, preferably Dillon Read, to assist the President and the Board in this matter.

Peter Detwiler spoke against the resolution, and Fred Detwiler, his nephew, questioned the resolution's legality.

Despite Peter Detwiler's opposition, the resolution passed by a vote of 704,796 shares to 384,258 shares. The shareholders who supported this resolution included

Philip Detwiler (on behalf of his family), Warren Kendall (on behalf of the Devereaux/Kendall family), Offenbecher, as well as Davies and Stewart (whose shares were voted by Offenbecher pursuant to proxy). Peter Detwiler and Bryant voted their family's shares against this resolution.

In his affidavit explaining his vote, Kendall stated:

> The family's decision [to sell Ferro] was made because of concerns about the cyclicality and long-term future of the Automotive division and because of our concern about having the bulk of our investments in one liquid asset. I was particularly concerned that Ferro's Automotive division would, as a result of the trend towards systems purchases by the automobile manufacturers, become a second-tier supplier, which would put downward pressure on earnings in the future; and I expressed that view to the others. In arriving at our decision, we evaluated and considered the opinion of [Dillon Read], as stated in their report dated April 25, 1984, and summarized in their report on August 15, 1984, as well as statements of Peter Detwiler that Ferro was worth far more than Dillon Read thought it was worth.

Philip Detwiler offered a similar explanation in his affidavit:

> [Our family] discussed [selling Ferro] approximately four times prior to the December 1984 shareholders' meeting. Our conclusion was that if a favorable price could be obtained, we would be in favor of a sale. In arriving at that decision, my family and I considered not only the report of [Dillon Read], dated April 25, 1984, but also statements made by Peter Detwiler to the effect that the Company was worth up to $100 million, had a bright future, and should not be sold. I, and other members of my family, were concerned about the long-term security of our investment in Ferro. The Company had a history of cyclical results that carried with it certain risks. For example, following the failure to sell the Company in 1978, the shareholder families risked the loss of all or most of their investment during the downturn that oc-

curred during the late 1970s and early 1980s. In addition, we were aware of changes in the markets which Ferro served, particularly the automotive market, which could well have made the future of the Company more of a gamble than previously.

The Plaintiffs note that Philip Detwiler did not consult with his family members at the annual meeting itself before voting his family's shares.

Immediately following the Shareholders' Meeting, the Ferro board met. At that meeting, Philip Detwiler proposed, and Warren Kendall seconded, the following resolutions:

> RESOLVED, that the President is authorized to proceed with negotiations for the sale or merger of the Company and to enter into a letter of intent which he deems to be in the best interest of the Company and its shareholders. Such letter of intent shall provide that it shall be subject to the approval of the Board of Directors of Ferro.

> RESOLVED, that the President is authorized to enter into an agreement to employ Dillon Read as financial advisor in connection with such possible sale or merger of the Company. The President is authorized to enter into a fee arrangement with Dillon Read which shall provide for a fee not to exceed 1¼ percent of the sales price or the fair market value of the securities received. Such arrangement may also provide for a downpayment not to exceed One Hundred Thousand Dollars ($100,000) plus out-of-pocket expenses. In the event of the consummation of a transaction, the downpayment and amount paid in reimbursement of out-of-pocket expenses shall be applied to the fee arrangement.

On December 20, 1984, Peter Detwiler prepared a memorandum that he either sent to Ferro's directors or discussed with them at a subsequent board meeting. The memorandum stated:

> While the Detwiler family did not agree with the decision to sell the company, once the decision has been taken by the

majority of the shareholders we will strongly support that decision and work vigorously along with the Bryants to attain the highest and best deal for the company. Obviously now everyone has an identity of interest.

The Bryant family shared this view.

## G. Retaining Dillon Read

Following the December 11, 1984 board meeting, Offenbecher verbally retained Dillon Read to market Ferro. Ferro and Dillon Read executed a formal agreement on January 2, 1985. Paragraph 2 of the letter agreement provided:

For Dillon Read's services pursuant to this Agreement, the Company agrees to pay Dillon Read fees in cash as follows:

a) upon execution of this Agreement, a fee of $100,000, and

b) if on or prior to December 31, 1985 any person ... acquires the Company ..., a fee equal to one and one-quarter percent (1.25%) of the aggregate amount of the consideration paid to the company and/or its shareholders (the "Consideration"), less the amount paid pursuant to paragraphs 2(a) or 2(c)....

c) If a Transaction is not consummated, the Company will reimburse Dillon Read, upon demand from time to time, for the expenses reasonably incurred by Dillon Read in entering into and performing this Agreement....

## H. Hutton's Initial Involvement in Selling Ferro

In January 1985, Hutton prepared an analysis of Ferro (the "Hutton Report"). Based upon the "Market Valuation of Comparable Public Companies with 50% Acquisition Premium," the "Price/Earnings Paid in Acquisitions of Comparable Companies," and the "Multiple of Book Value Paid in Acquisitions of Comparable Companies," Hutton valued Ferro at between $110 million and $188 million.

By letter agreements dated January 23, 1985 and January 24, 1985, the Ward Detwiler family and some members of the Bryant family hired Hutton as their financial advisor for a flat fee plus a percentage of the transaction price over $80 million. Also on January 24, 1985, Bryant met with three members of the Duffield family to persuade them to retain Hutton. Although Bryant indicated that Ferro's estimated sale price was $150 million and that he expected many of the Kendalls and Devereaux to support him, the Duffields declined to retain Hutton.

Using the Hutton Report, Peter Detwiler and Bryant also attempted to have Ferro retain Hutton to work with Dillon Read in selling the Company. On January 9, 1985, Bryant prepared a draft memorandum to the Ferro board proposing that the board "add E.F. Hutton to Ferro's team by a 'non-exclusive' contract with the same % commission offered Dillon Read." In addition, Peter Detwiler met with attorneys and Hutton representatives on January 23, 1984 to discuss the possibility of the Ward Detwiler and Bryant families contacting the other Ferro shareholders about retaining Hutton along with Dillon Read to sell Ferro.

A draft letter prepared in January 1985 for signatures of Bryant, William Bryant, Jr., Peter Detwiler, Fred Detwiler, and George Detwiler challenged Dillon Read's April 1984 valuation estimating Ferro's worth at approximately $60 million. It noted that representatives of the Ward Detwiler, Bryant, Duffield, and Clark families holding thirty-six percent of Ferro's stock had retained Hutton as their financial advisor and that Hutton had valued the Company at $120 to $150 million. The plaintiffs discussed the substance of this letter with other Ferro shareholders.

During late January and early February the Hutton Report was distributed to, or discussed with, Philip Detwiler, Sr., Philip Detwiler, Jr., a representative of the National Bank of Detroit, Warren Kendall, Offenbecher, Davies, Dillon Read, and Ferro's outside directors. On February 11, 1985, Offenbecher and Davies met with Kendall, Bryant, and Hutton representatives to discuss the Hutton Report. Offenbecher and Davies stated that the companies Hutton identified as "comparable" to

value Ferro in fact were insufficiently "comparable."

In his affidavit, Philip Detwiler stated: "At the request of Peter Detwiler and John Bryant, I considered having the Company retain Peter's firm, E.F. Hutton, to assist in the sale, but rejected that proposal because of my belief that Peter, being an officer of E.F. Hutton, would have a potential conflict of interest in connection with any representation by the Company of E.F. Hutton." Moreover, Kendall stated in his affidavit: "Based on my own knowledge of Ferro, its markets and prospects, as well as the discussions that I personally had with Messrs. Good and Finger of E.F. Hutton, I believed that the report substantially overstated the true value of Ferro." Ferro never retained Hutton.

In the course of representing some of Ferro's shareholders, Hutton approached several companies about purchasing Ferro.

## I. The 1985 Budget and the Five–Year Sales Forecasts

Ferro's 1985 Budget and five-year sales forecasts played a significant role in the selling process.

### 1. The 1985 Budget

For each of the years 1980 through 1984, Offenbecher and Davies directed Ferro's divisions to prepare a budget reflecting sales and expenses (the "Operating Budget") for the following fiscal year, which began September 1. The divisions prepared the budgets from May through August. Offenbecher and Davies participated in the process by touring the divisions, talking with the persons involved, and reviewing the budgets and their backup documents.

Upon receiving the Operating Budgets from the divisions, Offenbecher and Davies used those budgets to prepare a budget to present to the board (the "Directors' Budget"). The figures contained in the Directors' Budget usually differed from those in the Operating Budget because Offenbecher and Davies found that the divisions tended to be too optimistic regarding sales. The board reviewed the Directors' Budget,

neither approving nor disapproving it. At their depositions, Offenbecher and Davies testified that the board knew the figures in the Operating and Directors' Budgets differed, but Peter Detwiler and Bryant denied this in their affidavits.

As actual results became available during the fiscal year, each division submitted those results to Ferro's headquarters where the Accounting Department prepared monthly financial statements comparing actual results against the Operating Budget. Davies and Offenbecher reviewed these statements, then Offenbecher's secretary sent copies to the directors.

Pursuant to this process, the 1985 Operating Budget had been prepared during the summer of 1984, and the Ferro board reviewed the resulting Directors' Budget at meetings held on September 18, 1984 and November 13, 1984. When six-month results became available, Ferro revised its budget figures. Monthly memoranda from Kruske, VWG's president, to Offenbecher reveal that VWG's actual sales exceeded its forecast in December 1984, January 1985, and February 1985.

### 2. The Five–Year Sales Forecast

During 1984, management for each of Ferro's divisions worked with H. Vincent Nelson ("Nelson") to prepare five-year divisional marketing plans (the "Marketing Plans") containing five-year sales forecasts (the "Division Sales Forecasts"). Nelson was a former Vice–President of Operations of Ferro who worked as a consultant for the Company in 1983 through 1985. Nelson advised division management regarding the methodology and format for the Marketing Plans, but management alone determined the numbers to include in the Division Sales Forecasts.

While they were preparing the Marketing Plans, division management reported to Offenbecher regarding the plans' progress and the types of items covered in the plans. When they were finished, Offenbecher conducted a detailed page-by-page review of the Marketing Plans. According to

Kruske, this review resulted in no changes to VWG's Division Sales Forecast.

In late 1984, Offenbecher asked Nelson to analyze the Marketing Plans and Division Sales Forecasts and prepare a five-year sales forecast for each division and consolidated for the Company as a whole for FY 1985 through FY 1989 (the "Sales Forecast"). According to Nelson, Offenbecher told him to use his best judgment, and neither Offenbecher nor Davies suggested particular numbers to Nelson nor informed him of the project's purpose. Nelson completed this project by January 15, 1985. Both Offenbecher and Davies reviewed the figures in the Sales Forecast, but deny influencing or reducing the numbers.

Offenbecher presented the Sales Forecast to the Ferro board at its January 15, 1985 meeting. In response, the board passed a resolution stating:

RESOLVED: That the Board of Directors review the five year forecasts, as promptly as possible, which will include sales projections, forecasted balance sheets, forecasted statements of net income, and forecasted statements of sources and applications of funds.

Peter Detwiler and Bryant were critical of the Sales Forecast. In his affidavit, Kendall stated: "Based on my experience with the Company, I considered the forecasts to be optimistic."

Peter Detwiler testified that Offenbecher agreed not to distribute the forecasts to Dillon Read or any prospective purchaser, although the minutes contain no reference to this discussion.

## J. The General Motors Contract

In early 1985, General Motors ("GM") began searching for a supplier to design, prototype, and manufacture "total seats" for a Camaro/Firebird replacement car it planned to introduce in or after 1990 (the "GM80"). At the time, Ferro had built two total seat prototypes, one for a Cadillac and one for a Jeep. Although it had never sold a total seat to an automobile manufacturer, Ferro competed for the GM80 contract. On February 5, 1985, Ferro and GM met to discuss the GM80.

Ferro included in both the Sales Forecast and the Supplemental Forecast the "total seat" sales it anticipated from the two prototypes it had developed—$6 million in 1988 to AMC Jeep and $17.9 million in sales in 1989 to AMC and one or more GM car lines.

Ferro did not include in its forecasts sales attributable to the GM80 contract. Stewart, the head of Automotive, believed Ferro had little chance of being selected as the GM80 supplier. Eugene Goodson of Hoover testified that Ferro had "zero chance" of getting the GM80 contract and that Ferro's inclusion of GM80 sales in a sales forecast would have been a "pipe dream."

In May 1985, GM selected several companies—including Hoover, Lear Siegler, and Inland—to make presentations regarding the GM80. Ferro was not among this group, but it contacted GM and GM allowed it to make a presentation. GM's evaluations of the various presentations reveal that Hoover was the leading contender for the GM80 and that Ferro was not highly rated. Subsequently, Offenbecher decided not to pursue the GM80 contract. Hoover obtained the GM80 project, and—when GM subsequently cancelled the GM80 project—Hoover gained no sales under the program, received no replacement business from GM, and was reimbursed only half its expenses.

## K. The Selling Process

### 1. Implementation of a Controlled Auction

After Ferro retained it, Dillon Read implemented a controlled auction to sell Ferro. Dillon Read consulted with Ferro's board, then confidentially contacted over seventy potential purchasers that it believed might want to acquire one or more of Ferro's divisions.[4]

---

4. Christian Eisenbeiss ("Eisenbeiss"), a former Dillon Read associate, stated in his deposition that "the decision had been made to sell the company as a whole" and that Dillon Read was approaching "mainly ... people who would be interested in Ferro as a whole." However, the

Hoover's and Hutton's interest in acquiring Ferro developed early in the process. In a November 15, 1984 memorandum to the file, Peter Detwiler discussed the possibility of Hutton sponsoring an LBO in which Peter Detwiler's family would participate:

I have now spoken to Bob Fomon [Hutton's CEO] through Harvey Spear an attorney working with our LBO group. E.F. Hutton may be interested in coming in and participating in putting this LBO together. We need an entity like this to sell the deal and Hutton invests its own capital in these deals to help glue the package together. Fomon seemed quite interested and I am going to talk to him as soon as I get into the office. I would try to get approximately 12% more of the company out for the family to compete for the higher tax that would be paid by "re-pricing" the stock by the Buy Out.

In December 1984, after the Ferro shareholders resolved to obtain bids at the Shareholders' Meeting, Smith—who was a Hoover director at the time—contacted Hoover to suggest that it consider buying Ferro as part of its diversification efforts. Hoover's principal business involved manufacturing automobile seat cushions, and Hoover hoped to expand its operations to include automobile seat tracks and recliners, which Automotive manufactured. In late January or early February 1985, Offenbecher and Jack Daly, Hoover's President and CEO, met over lunch to discuss Ferro.

Dillon Read sent a standard confidentiality agreement and an executive summary to any prospective purchaser who expressed interest. The executive summary's first page stated: "The management of the Company should *not* be contacted under any circumstances. All inquiries or requests for additional information should be addressed to Dillon Read."

Dillon Read also began a six-week due diligence review of Ferro in January 1985. This consisted of internal research regard-

ing the Company and its markets, as well as plant visits and interviews with Company personnel, including visits to Automotive (where Dillon Read interviewed Stewart), Aerospace (where it interviewed Grimes), and VWG (where it interviewed Kruske).

At Ferro's January 15, 1985 meeting, Offenbecher discussed the prospective purchasers Dillon Read had contacted and "pertinent information concerning Dillon Read's assignment."

On February 6, 1985, Offenbecher and Davies received copies of a draft report Dillon Read was preparing to send to prospective purchasers (the "Selling Memo"). They reviewed the draft and gave Dillon Read detailed comments concerning the draft. In its final form, the Selling Memo incorporated both the 1985 Budget and the Sales Forecast.

When prospective purchasers executed the confidentiality agreement, Dillon Read sent them the Selling Memo. The Selling Memo stated:

The information contained in this Memorandum has been supplied by [Ferro] and is furnished solely for use by prospective purchasers in considering their interest in acquiring the Company.... No representation or warranty is made with respect to the accuracy or completeness of this Memorandum by the Company or by [Dillon Read], nor has Dillon Read independently verified the information contained herein.

At the direction of Ferro's board, Dillon Read limited the information it disclosed to the Company's direct competitors, such as Magna and I.T.T. Hancock, prior to gauging their interest.

In addition to the Selling Memo, Dillon Read provided other information, depending upon the needs of the particular prospective purchaser. For example, Dillon Read furnished actual results for the current year. It also told those who wanted to buy less than the entire company that tax considerations required that bids for com-

Ferro project was one of Eisenbeiss's last assignments at Dillon Read, and he left the firm in

January 1985 before the selling process began.

ponents would have to total more than a bid for the entire company to be accepted.

Some of the companies who received the Selling Memo expressed interest in acquiring only one or two of Ferro's divisions, rather than the entire company. For example, in February 1985, Ametek expressed interest in acquiring VWG and Aerospace, Fruehauf sought to acquire Automotive and Aerospace, IFI International wanted only Automotive and/or Aerospace, and SKF Industries indicated an interest in VWG and Aerospace.

In early March 1985, Dillon Read required bidders to submit confidential written indications of value so it could reduce the number of prospective purchasers to five or six. It sent possible buyers further business and financial information regarding Ferro (the "Detailed Memo"), along with a form "Indication Letter" requiring the companies to indicate the amount they "would be prepared to [pay to] acquire all of the capital stock of Ferro...." Dillon Read also advised prospective purchasers that it intended to use the Indication Letters "to qualify companies for in-depth investigation of Ferro (plant tours, meetings with management, etc.)...."

This request elicited fourteen indications of value for the entire company and seven indications of value for components. Dillon Read then contacted marginal bidders about increasing their indications of value, as well as other prospective purchasers to determine whether they wanted to submit an indication of value.

Because the indications of value it was receiving for the entire company were the same or higher than those it was receiving for components, Dillon Read began focusing on those interested in buying the entire company, although it also maintained contact with the others in case the situation changed. Dillon Read also told those companies who wanted to buy only part of Ferro that bids for the Company as a whole had a better chance of succeeding because

of the tax implications of selling the Company piecemeal.

I.T.T. Hancock, which manufactured and sold automobile seat systems, was one of the companies interested in acquiring only part of Ferro. At his deposition, Edmund M. Carpenter ("Carpenter"), head of that Company's Automotive Group, testified that he contacted Dillon Read about acquiring Automotive and to obtain further information. According to Carpenter, Dillon Read told him Ferro was "for sale in total" and declined to provide further information. Because I.T.T. Hancock was one of Automotive's direct competitors, this refusal complied with the board's directive that Dillon Read limit the information it distributed to direct competitors.

Throughout March 1985, Ferro's board convened frequently to review Dillon Read's selling process and to analyze and update the Sales Forecast. The board met on March 1, March 6, March 14, March 22, and March 29 (collectively, the "March Board Meetings").

### 2. Reviewing Dillon Read's Selling Process

Dillon Read representatives attended the March 1, 1985 board meeting to discuss the procedures followed, the timetable, and the status of companies contacted. At that meeting, Peter Detwiler distributed and discussed a document the law firm of Cadwalader, Wickersham & Taft ("Cadwalader") had prepared called "Excerpts from the January 29, 1985 Decision of the Supreme Court of Delaware in the *Trans Union Corporation*[5] case."

At its March 6, 1985 meeting, the board adopted resolutions to involve its outside directors in the sale process:

RESOLVED: That as he proceeds to carry out the December 11, 1984, mandate of the Board of Directors to negotiate an agreement for the sale of the stock or the merger of the Company, the President shall consult with and furnish key information to a Committee consist-

---

**5.** This is a reference to the Delaware Supreme Court's decision in *Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985).

ing of R.E. Fister, W.R. James, and P.S. Mirabito, the Company's outside Directors, or any of them where the circumstances so require, concerning those negotiations; and

RESOLVED FURTHER, that each of the other Directors of the Company is urged to utilize the Committee as the medium through which his individual views and recommendations relating to the President's negotiations are conveyed to the President.

The Ferro board also considered selling the Company piecemeal. Peter Detwiler proposed the following resolution:

That the President of the Corporation be and he hereby is directed to request Dillon Read and Company to advise the Corporation as to the best procedure to follow to obtain the highest possible price for the sale of the three divisions of the Corporation, either separately or together, and either for cash, securities or a combination thereof, and the likely period of time required to obtain such price.

Five directors, including Philip Detwiler, James, Kendall, Offenbecher, and Smith, voted against the resolution, and it was defeated. Offenbecher and Smith opposed the resolution because they believed the term "highest possible price" was unclear. Fister abstained because he found the resolution "superfluous"—he believed Dillon Read already was attempting to obtain the best price for Ferro.

The board then passed unanimously a resolution proposed by Smith that "Touche Ross & Co., Clark Klein & Beaumont, and Dillon Read advise the Board of the practical and price considerations to be considered by the Board in the sale of the Company's operating divisions and whether it can be carried out in a reasonable time frame."

Pursuant to the board's March 6, 1985 resolution, representatives from Touche Ross, Clark Klein, and Dillon Read met several times in mid-March to discuss the tax implications of selling Ferro's divisions separately and to prepare a presentation to the board. In addition, Davies met with Pat Mansfield and Harvey Schatz of Touche Ross regarding Touche Ross's presentation to the board planned for March 14, 1985. From these discussions, Touche Ross prepared a schedule showing the amount of tax recapture for depreciation and investment tax credits ("ITCs") involved in a sale of Ferro's separate components.

On March 13, 1985, the special committee met with Peter Detwiler, two Hutton representatives, and Offenbecher at Hutton's New York office to hear Hutton's opinion regarding Ferro's value. At that meeting, Peter Detwiler and Hutton presented a document dated March 13, 1985 called "Ferro Marketing Strategy" setting forth various opinions as to how to sell Ferro and amend its projections.

The Ferro board met again on March 14, 1985. The meeting began with a presentation by representatives from Dillon Read, Clark Klein, and Touche Ross regarding the sale of Ferro's components. Dillon Read told the board they were identifying possible purchasers for the Company as a whole as well as its divisions and that some companies had expressed interest in acquiring one or more of the divisions.

Touche Ross presented a memorandum to the board entitled "Analysis of Tax Liability From Depreciation Recapture, LIFO Reserve Recapture and ITC Recapture." Also distributed at the March 14, 1985 board meeting was a document entitled "Factors to Consider in Sale or Merger of Ferro Manufacturing Under Various Alternatives." The latter document—which formed the basis of the board's discussion—identified the problems with selling the Company piecemeal as including:

1. Recapture of ITC, depreciation and LIFO reserves by Ferro prior to liquidation (estimated tax liability of approximately $13 million on a consolidated basis).

2. Must be completed in 12 months; if not, taxable at corporate level at corporate rates, then taxed to shareholders on distribution. Liquidating trust not available for operating assets.

3. Difficult to allocate debt, liabilities and LIFO reserves among divisions and

subsidiaries. Any debt not assumed by purchasers must be repaid, causing cash flow difficulties.

4. Unavailability to purchaser of pooling of interest accounting treatment.

5. Significant additional accounting and legal costs (will need separate restated and audited financials).

6. Shareholder liability for residual claims.

7. Possibility that aggregate price may not be higher than would have been paid by a purchaser who could sell off unwanted parts at a favorable price.

8. If distributions are stretched over two shareholder tax years, capital gains treatment could change under a new tax bill.

Offenbecher told the board that he believed Automotive would be more difficult to sell than the other divisions. At the time, he knew prospective purchasers, including United Technologies, had indicated interest in acquiring Automotive.

Dillon Read representatives next updated the board on the sale process and the indications of interest received to date. Dillon Read presented an update of its 1984 valuation of Ferro. The update valued the Company as a whole and as the sum of its components. Dillon Read estimated the latter at between $85 and $99 million, but it noted that tax recapture of about $13 million reduced the range to between $72 and $86 million. Dillon Read stated that the shareholders would get more if they sold the Company as a whole. Peter Detwiler presented Hutton's opinions regarding how Ferro should be sold and the projections amended.[6]

Ferro's board decided to focus on selling the Company as a whole, while maintaining contact with bidders interested in components in case circumstances changed. According to Fister's deposition testimony, the tax implications of a piecemeal sale and the fact that Dillon Read was receiving offers to buy the whole company at a rea-

sonable price convinced the board that it would be better to sell the Company as a whole.

Following the March 14, 1985 meeting, Smith resigned from Hoover's board. When Smith resigned from Hoover's board, he assumed that Hoover wanted to buy the entire company and did not know that Hoover had any interest in acquiring only Automotive. Upon resigning from the Hoover board, Smith did not discuss the Ferro acquisition with Hoover.

Dillon Read again presented an update of its activities at the board's March 22, 1985 meeting.

### 3. Analyzing the Sales Forecast

On February 22, 1985, Peter Detwiler, Bryant, and Hutton representatives met with Dillon Read to review and discuss the process Dillon Read was using to market Ferro. Upon learning that the Selling Memo sent to prospective shareholders had included the Sales Forecast the board had questioned at its January 15, 1985 meeting, Peter Detwiler and Bryant sent Offenbecher a letter requesting him to convene a special meeting of Ferro's board for March 1, 1985.

Prior to the March 1, 1985 meeting, Peter Detwiler asked Hutton to review the Sales Forecast. In response, Hutton prepared a document called "Projections" that reflected its views regarding the Sales Forecast. Peter Detwiler distributed the "Projections" document at the March 1, 1985 board meeting. Peter Detwiler also consulted with Webster & Sheffield about the Sales Forecast. That firm prepared a resolution including proposed changes that Peter Detwiler presented at the March 14, 1985 board meeting.

At the March 1, 1985 board meeting, Peter Detwiler and Bryant objected to Dillon Read's including the Sales Forecast in the Selling Memo, and there was some discussion regarding whether it was proper for Offenbecher to have provided that fore-

---

**6.** At his deposition, Offenbecher testified that he believed it would be unlikely that a component sale could be sufficiently higher than a sale of the company as a whole to offset the tax liabili-

ty. Similarly, Dillon Read testified that it believed selling Ferro as a whole would generate the best net price—the cash shareholders actually would receive.

cast to Dillon Read. Peter Detwiler also distributed a memorandum claiming that the budgets for the previous four years had underestimated Ferro's sales and profits.

Ferro's board met again on March 6, 1985. At that meeting, Offenbecher distributed the Nelson backup to the Sales Forecast. He also distributed a one-page document setting forth the Sales Forecast at the top half of the page and a "More Realistic Scenario" at the bottom half of the page. The latter projected lower sales in each of the fiscal years 1986 through 1989 than the former.

Following the board's March 14, 1985 meeting, Offenbecher and Davies prepared a draft revised five-year forecast for Ferro (the "Revised Forecast").

At its March 22, 1988 meeting, Ferro's board discussed the Revised Forecast together with related financial statements. According to Peter Detwiler and Bryant, Offenbecher advised the board that the Revised Forecast represented the best estimate of Ferro's financial future based upon reasonable assumptions. At Philip Detwiler's suggestion, the board then directed management to revise the forecasts further to reflect sales attributable to three hypothetical acquisitions Ferro might make in the future.

Between March 23, 1985 and March 28, 1985, Davies and Offenbecher further revised the draft financial forecast.

Based upon its efforts during March, the Ferro board at its March 29, 1985 meeting voted unanimously to adopt a revised version of the Sales Forecast (the "Supplement"). The Supplement updated the Sales Forecast by including (a) full *pro forma* financial projections for FY 1986 through FY 1989 (balance sheets and profit and loss statements in addition to sales forecasts), (b) an updated 1985 Budget reflecting the actual six-month results ending February 28, 1985 and a forecast of the remaining six months revised to reflect the actual six-month results, and (c) sales attributable to Ferro's hypothetical acquisitions of three companies in the aerospace and gear businesses.

Dillon Read stated in its affidavit that it determined that the information contained in the Sales Forecast and the Supplement were reasonable. In April 1985, Peter Detwiler wrote regarding the Supplement that "[t]he forecasts reviewed and approved by the board at its March 29, 1985 board meeting correctly display the attractiveness of the Company...." In the same memorandum, however, he expressed concern about their remedial effect, noting:

> these projections have not been given to any bidders, and when they go out one will have to explain why the wrong projections were incorporated in the definitive Dillon Read sales memorandum. The credibility of the projections are drastically reduced.

The following chart compares the Sales Forecast, the Supplement, and the Actual Results:

### COMPARISON OF FORECASTS USED IN THE SALE TO ACTUAL RESULTS BY DIVISION FIVE–YEAR
(Sales in Millions) [i]

| DIVISION | FY85 | FY86 | FY87 | FY88 | FY89 |
|---|---|---|---|---|---|
| **Aerospace** | | | | | |
| Original (Ex. 23) | $27.6 | $34.5 | $43.2 | $54.0 | $67.5 |
| Supplemental (Ex. 37) | 27.1 | 34.5 | 43.2 | 54.0 | 67.5 |
| Actual [ii] | 26.7 | 36.2 | 39.1 | 31.9 | N/A |
| | | | | | |
| **VWG** | | | | | |
| Original (Ex. 23) | 40.7 | 55.8 | 61.1 | 64.1 | 67.3 |
| Supplement (Ex. 37) | 50.3 | 55.8 | 61.1 | 64.1 | 67.3 |
| Actual [ii] | 47.4 | 36.1 | 32.6 | [iv] | N/A |

| DIVISION | FY85 | FY86 | FY87 | FY88 | FY89 |
|---|---|---|---|---|---|
| Auto (incl. Plastics) | | | | | |
| Original (Ex. 23) | $123.6 | $134.3 | $151.0 | $176.2 | $194.3 |
| Supplement (Ex. 37) | 131.4 | 134.2[iv] | 150.9[iv] | 176.2 | 194.2[iv] |
| Actual [iii] | 130.6 | 129.0 | 136.2 | 160.2 | N/A |

[i] For comparative purposes, forecasted sales exclude sales attributable to hypothetical acquisitions since no acquisitions were made.

[ii] *Source:* Records of American Technologies, Inc.

[iii] *Source:* Records of Johnson Controls, Inc.

[iv] Rounding differences.

[v] VWG was sold in 1988.

### 4. Completing the Selling Process

When Dillon Read received the Supplement in late March or early April 1985, it distributed the document to the remaining bidders, as well as to other prospective purchasers it believed might renew their interest in light of the Supplement. Dillon Read decided not to distribute the Supplement to some of the companies that had dropped out of the auction prior to March 29, 1985.

After reviewing the Supplement, Hutton, Lear Siegler, FASCO, Hoover, the Marmon Group, and Citicorp criticized the use of sales for hypothetically-acquired companies. At the prospective purchasers' request, Dillon Read provided projections without the hypothetical acquisitions.

On April 8, 1985, Hutton sent George Detwiler and Fred Detwiler a Hutton-sponsored LBO proposal that would have involved investment by family investors. On May 6, 1985, Peter Detwiler met with Philip Detwiler and Warren Kendall to inquire whether the other shareholder families would join the Ward Detwiler and Bryant families in an LBO of Ferro. The other shareholder families rejected the proposal.

In an April 29, 1985 draft memorandum addressed to all Ferro shareholders, Peter Detwiler described in detail for the other shareholders his reasons for opposing the sale to Hoover. These included:

1) Peter Detwiler and Bryant families believed Ferro had not obtained the best price.

2) Ferro should not have selected Dillon Read because other firms existed who were larger and more active in takeovers, including First Boston, Morgan Stanley, and Goldman–Sachs.

3) A company-sponsored announcement of the proposed sale would have been preferable to Dillon Read's use of a controlled auction.

4) Dillon Read had included projections in the Selling Memo that the board had not ratified.

5) The Selling Memo included a projection for FY 1985 that showed a downturn in earnings, for the first time in many years. The effect was to reduce artificially the company's value. The forecasts the Ferro board had reviewed and approved at its March 29, 1985 meeting correctly displayed the company's attractiveness and demonstrated growth in 1985 instead of the downturn the Selling Memo indicated, as well as a fifteen percent growth in earnings over the next five years.

6) Projections were the most critical information for valuing a company, but Dillon Read had not distributed these to prospective purchasers until April 15, 1985. By then, however, many bidders had indicated no interest in the company or dropped out of the auction.

7) Management was pursuing its own interests in promoting a sale. Purchasers can obtain a lower price by offering management high salaries, job security, and other benefits in the new entity in return for management's support and cooperation. In Ferro's case, a piecemeal sale of the company's component parts threatened management because there would be

no positions for top management in the new entity.

8) Based on the price earnings multiple of JCI's acquisition of Hoover, Ferro was worth $120 to $150 million.

At his deposition, Peter Detwiler testified that he discussed these concerns with the board, but not with the shareholders generally.

The Ferro board held a meeting on May 6, 1985, which representatives from Dillon Read and Clark Klein attended. According to the Defendants, Dillon Read reviewed the status of the sale process and suggested a one-time blind bidding procedure as the best method for ending the auction to maximize returns to shareholders. According to Kendall, Philip Detwiler, James, and Offenbecher, the board approved this suggestion. Peter Detwiler and Bryant deny this, stating that the board did not determine the mechanics of the final bidding procedure and that appointed a special committee to determine how and when Dillon Read would receive the bids.

Clark Klein advised the board about the legal and tax consequences of a stock for stock merger and a combination stock and cash transaction. It also discussed the directors' obligations under the recent *Trans Union* decision.

The board unanimously adopted the following resolutions:

RESOLVED: That a committee consisting of D.J. Offenbecher, as Chairman, R.E. Fister, W.R. James, and P.S. Mirabito, is appointed to proceed with the process of obtaining bids from parties interested in acquiring the business of Ferro, either through merger or purchase and report regularly to the Board and proceed with the preparation of a letter of intent for such sale or merger, which letter shall be subject to the approval of the Board of Directors;

BE IT FURTHER RESOLVED: that D.J. Offenbecher continue to negotiate on behalf of the Company in obtaining said bids, and that the committee is directed to appoint from the committee another member to participate with D.J. Offenbecher in such negotiations; it be-

ing understood that D.J. Offenbecher is to participate in the negotiations unless the Board directs otherwise.

The special committee met later that same day.

On May 10, 1985, Offenbecher had a forty minute phone call with James, one of the outside directors. Offenbecher told James he had met with Daly, Hoover's chairman. When James asked Offenbecher "how [Offenbecher] would make out," Offenbecher said: "5 buyers, 3 OK—1 I would not survive." Offenbecher's notes from that phone call indicated that James was "very upset" with Mirabito, another outside director, whom James believed was "Peter[ ] [Detwiler's] man & will screw deal up." James indicated that he believed the "committee w[ith] Paul [Mirabito] in present position is wrong." James also stated that he "[w]ants to get deal done & is a supporter."

On May 14, 1985, later than the other bidders, Hutton submitted its indication of value to Dillon Read. Gary Finger, Peter Detwiler's advisor and associate, previously had told Hutton the identity of the other bidders and the amount of their indications of value, and Hutton prepared its indication of value based upon this information.

During April and May, Dillon Read proceeded with plant tours and due diligence for the final round bidders, including Hutton, Citicorp Venture Capital ("Citicorp"), FSC Corporation (in conjunction with General Electric Credit Corporation) ("FSC"), Hoover, and FASCO Industries, Inc. ("FASCO"). Toward this end, Dillon Read provided plant tours, interviews with Company personnel, financial information, and product and customer data. Dillon Read also arranged for the bidders to interview division personnel in the absence of corporate officers.

In early May, Dillon Read told the final round bidders to firm up their financing arrangements as best they could. It gave the bidders draft contracts of sale with instructions to note all material changes and told them to submit their best and only bid by May 31, 1985.

On May 31, 1985, Dillon Read received bids for Ferro from Hutton, Citicorp, FSC, Hoover, and FASCO. Hoover bid $98.1 million for the Company as a whole. Hoover prepared its indication of value and its final bid without consulting with Citicorp, and Hoover did not know the identity of other bidders or the amounts of their bids when it submitted its final bid. Lear Seigler, Hoover's primary competitor on the automotive side of the business, withdrew from the auction late in the process, but Hoover did not know this when it submitted its bid.

Hutton bid $106 million for the LBO of the Company. Peter Detwiler had met with Hutton in late May to help it prepare this bid. He disclosed information contained in status reports Dillon Read had submitted to Ferro's board and suggested that a successful bid would have to be over $100 million. At the time Hutton submitted its bid, Hutton had offered the Plaintiffs the opportunity to participate in Hutton's LBO by reinvesting on the same terms as Hutton would invest.

Citicorp bid $95 million for Ferro, which was higher than the indication of value it had submitted on March 8, 1985. Citicorp prepared its indication of value and its final bid without consulting with Hoover, and Citicorp did not know the identity of other bidders or the amounts of their bids when it submitted its final bid. As a condition of its bid, Citicorp stated: "The offer is contingent upon the participation by senior management of Ferro in the equity of new Ferro and the continued employment of Dale Offenbecher and John Davies in their current positions." At his deposition, a Citicorp representative explained the reason for this condition: "[W]e don't want to inherit a business without management, so we wanted the management to continue to work, continue to manage the business." He added: "We want to see [management] properly incentivized and working in the business, because we're not operating managers."

On June 3, 1985, Ferro's three outside directors met with Offenbecher and Dillon Read for three and one-half hours to review the final bids. On June 4, 1985, Offenbecher made a handwritten note stating: "Told Jack [Daly, Hoover's chairman,] I would do everything I could to deliver company to him. He would be the 1st person Dillon Read called after the [Ferro board] reached a decision. He said he wanted me to be a part of their organization."

Also on June 4, 1985, Offenbecher met with Philip Detwiler and Kendall to discuss the final bids. At his deposition, Kendall testified: "[Offenbecher] indicated ... that there were several offers that were lumped together in a close range and that there was one that was not, and something to the effect that it is the worst thing that could have happened, the worst possible situation or something like that, in a light-hearted manner-type thing without ... any discussion of valuations or companies."

The special committee met again on June 5 for one and one-half hours to review the final bids. Freeman, counsel to the special committee, attended the June 5 meeting to explain the committee's obligations under Michigan law.

Ferro's full board also scheduled a meeting for June 5, 1985 to consider the final bids. That morning, Peter Detwiler met with his financial and legal advisors to discuss strategy for the board meeting. Prior to that meeting, one of his advisors had prepared a handwritten note entitled: "PMD [Peter Detwiler] Agenda—Manipulate Meeting." At his deposition, that advisor testified regarding the items in that note:

I think these were all thoughts that we considered as items for consideration in preparation for [the June 5] meeting. I don't know how many of them were conveyed to Mr. Detwiler.

The board met to review the final bids for more than six hours. At that meeting, Dillon Read presented a document entitled "Summary of Process" describing the process by which Dillon Read had marketed Ferro. It also discussed with the board a document containing the final bids and the prior indications of value the final bidders had submitted.

Dillon Read told the board it believed that Hoover's $98.1 million bid was at the high end of the fairness range and recommended that the board accept it over the competing bids. Dillon Read offered the board several reasons for accepting Hoover's bid over Hutton's $106 million bid. Dillon Read suggested that Hoover's bid had a higher probability of completion because it was not subject to financing or to major revisions in the contract and because Hoover had conducted a significant amount of due diligence. Dillon Read also explained that LBO bids are more likely to be negotiated downward—or not to close at all—once the sources of debt financing begin due diligence. This risk arose particularly with respect to Hutton's bid, Dillon Read explained, because neither Hutton nor its sources of debt financing had conducted much due diligence and the head of Hutton's high yield bond group had expressed concern about the cyclical nature of Ferro's business and the "aggressive" projections supporting Hutton's bid. The outside directors also recommended that the board accept Hoover's bid.

Peter Detwiler told the board he had "just learned on the morning of June 5, 1985, that one-third of the Hutton equity interest in the contemplated Ferro LBO proposal by Hutton would be offered to the Ward Detwiler and Bryant families if the Hutton proposal is accepted." The board adjourned the meeting for fifteen minutes, allowing Peter Detwiler to consult with his advisors. According to Peter Detwiler, he wanted more time, but Offenbecher refused. Following the break, Peter Detwiler told the board the Hutton proposal no longer was contingent upon any investment by Ferro management. Bryant asked the Dillon Read representatives about the chances of correcting the Hutton financing problems or improving the Hoover bid.

Smith, who had resigned as a Hoover director on March 14, 1985, described his past and present connections with Hoover and identified the assignments his firm had performed and was performing for Hoover. Smith did not reveal his role as legal counsel for a majority of Ferro's shareholders.

After hearing the recommendations of Dillon Read and the outside directors, Peter Detwiler and John Bryant moved to adjourn the meeting for three business days to further study the bids and consider the Special Committee's report.

Offenbecher responded that an adjournment was inappropriate because the board had been working on a sale or merger long enough to be prepared to make a decision. He added that the board should continue to review the information and that Dillon Read representatives would remain available to answer questions. Smith stated that he agreed with Offenbecher's remarks.

Dillon Read advised the board that a substantial delay could prompt Hoover to reduce or withdraw its bid. Hoover's chairman had told Dillon Read that his company was prepared to pay top dollar for Ferro out of concern that Lear Siegler otherwise would buy the Company and gain a competitive advantage. At that point, however, Lear Siegler had dropped out of the bidding process, and Dillon Read feared that a delay would risk Hoover discovering this fact. Dillon Read also informed the board that it doubted Hutton could improve its bid.[7]

The seven other board members rejected Peter Detwiler's and Bryant's motion for an adjournment, reasoning that the board already had all the facts necessary for a decision, Dillon Read had told both Hoover and Hutton to complete their due diligence and firm up their financing before submitting their final bid, and a delay could jeopardize the Hoover bid.

By a vote of seven for (Kendall, Philip Detwiler, Fister, James, Mirabito, Offen-

---

7. The Plaintiffs describe Dillon Read's statements regarding the risk that Hoover would withdraw its bid in the event of delay as "erroneous" and "without any reasonable or factual basis." They cite Daly's deposition testimony to support this contention. However, Daly testified that, although he did not recall telling Dillon Read that Hoover would withdraw its bid in the event of delay, "[he] may have done that" and "[i]t's not out of character for [him] to have said that."

becher, and Smith) to one against (Peter Detwiler) with one abstention (John Bryant), the Ferro board resolved to accept Hoover's bid.[8] None of the directors had made a valuation of Ferro independent of the bids received. Prior to the vote, Peter Detwiler spoke out against the resolution.

In his affidavit, Kendall stated:

At the time that I made that decision I was aware of the facts that:

a. Peter Detwiler had stated the opinion that the January 1985 sales forecasts may have adversely impacted the sale.

b. Peter Detwiler and E.F. Hutton had stated the opinion that the Company was worth dramatically more than the Hoover bid.

c. Peter Detwiler and E.F. Hutton had stated the opinion that the sales procedures used by Dillon Read were not designed to obtain the highest possible price for the Company.

d. Peter Detwiler had objected to any involvement in the sales process by Sid Smith or his law firm because Mr. Smith had been a director of Hoover and his firm was counsel to Hoover.

e. Peter Detwiler had objected to any involvement by Dale Offenbecher in the sales process.

Following the June 5, 1985 board meeting, the Plaintiffs consulted with their advisors about whether to sue for an injunction, wage a proxy fight, take the Hutton proposal directly to the Ferro shareholders, or bring an action for damages.

From June 5, 1985 through the final closing, Ferro retained Dickinson Wright as special counsel to represent it in consummating the sale to Hoover and to prepare the proxy statement.

A draft sale agreement (the "Draft Agreement") had been transmitted to the final bidders and Ferro's board in mid-May 1985. During June 1985, Dickinson Wright drafted and negotiated a final Reorganization Agreement and Plan of Merger (the

"Agreement"), which was substantially the same as the Draft Agreement. The principal revisions included:

1) the addition of the following representations and warranties by Ferro:

(a) Ferro had no outstanding options, warrants or rights to purchase Ferro shares (new § 2.2; *see also,* new § 7.1.5(c)),

(b) Ferro had no material contingent liabilities relating to the pension plans to which it contributed and the funding status of each plan was substantially the same at the closing date as it was in the January 1, 1984 actuarial reports (new § 2.8),

(c) Ferro had no material contingent liabilities relating to retiree medical insurance (new § 2.9),

(d) Ferro had filed all required tax returns and had paid all taxes (new § 2.10),

(e) Ferro's accounts receivable and backlog orders arose in the ordinary course of business (new § 2.12),

(f) Ferro had made timely claims under its insurance policies (new § 2.13),

(g) the sale and merger of Ferro would not breach any lease, no consents were required, and no assets were owned by the shareholders or third parties (new § 2.15),

(h) all material trade secrets (new § 2.17.12), required permits (new § 2.17.13) and all notes and instruments relating to any outstanding indebtedness of Ferro (new § 2.17.14) were scheduled,

(i) the patents, trademarks, and trade secrets, as scheduled, were all that were required for Ferro's business, and Ferro's business as then conducted did not violate any patent, trademark, or trade secret of any other person. (new § 2.21);

2) the deletion of representations and warranties by Hoover about its equity capitalization (because this was a cash deal);

**8.** Johnson Controls, Inc. ("JCI") acquired Hoover in May 1985. In June 1985, Hoover assigned JCI its right to purchase Ferro. For clarity, this opinion refers to "Hoover" throughout.

3) the addition of a "no shop" requirement (pending the anticipated closing) and a termination provision (new §§ 6.2, 9.1);

4) the deletion of a provision regarding the continuation of directors' and officers' insurance on behalf of the former Ferro officers and directors (new § 7.2.6); and

5) the addition of a provision for a fairness opinion (new § 7.2.9).

At the Ferro board meeting held on June 27, 1985, Dickinson Wright reviewed in detail each section the Agreement. The board approved the Agreement by a vote of six to two, Peter Detwiler and Bryant in opposition.

At the same time it was finalizing the Agreement, Dickinson Wright was preparing the proxy statement. At more than one lengthy meeting, Offenbecher and Smith met with Dickinson Wright for a line-by-line review of the proxy statement.

Ferro mailed the proxy statement to its shareholders on July 1, 1985. The proxy statement disclosed that Smith had served as a Hoover director until he resigned March 14, 1985. It stated that Smith's law firm served as general counsel for Ferro, had been regular outside counsel for Hoover until JCI acquired that company, and continued to represent Hoover in certain matters.

On July 7, 1985, Dillon Read issued a written fairness opinion regarding Hoover's acquisition of Ferro. That opinion concluded: "We are of the opinion that the cash consideration to be received by holders of Common Stock in the Merger is fair to such holders from a financial point of view as of the date hereof."

The National Bank of Detroit held 204,312 Ferro shares in trust for members of the Rollo W. Detwiler and William C. Devereaux families. In early July 1985, a member of the bank's closely-held assets division reviewed Hutton's valuation and independently analyzed Hoover's bid, then recommended voting the shares in favor of Hoover. The bank's trust executive committee reviewed this recommendation and unanimously approved it.

Ferro's shareholders met on July 25, 1985 to consider and vote on the Agreement. Peter Detwiler told the other shareholders that the Ward A. Detwiler family would vote against the sale because of the low price per share and the way in which it had been obtained. John Bryant concurred.

The shareholders rejected Peter Detwiler's arguments, adopting the following resolution by a vote of 810,402 shares to 295,170 shares:

RESOLVED, that the Plan of Merger pursuant to which [Ferro] will become a wholly-owned subsidiary of Johnson Controls, Inc. ... and the shareholders of Ferro will receive $87.59 in cash for each share of Ferro Common Stock held by them be, and the same is, approved.

The parties voting in favor of the sale included the Rollo W. Detwiler family, the William C. Devereaux family, the Duffield branch of the Bryant family, management, and the National Bank of Detroit as trustee of four trusts for the Rollo W. Detwiler and William C. Devereaux families. The parties voting against the sale included the Ward A. Detwiler family and the Bryant family. Hoover's acquisition of Ferro closed on July 31, 1985.

On September 27, 1985, Smith wrote a letter regarding the allocation of Clark Klein's fees for representing "a majority of the shareholders of [Ferro] for the past two years," including the Richard C. Devereaux family, the Rollo Detwiler family, and the Shirley D. Kendall family. He described the firm's services as relating to "the many tax considerations, alternate investment considerations, the legal representation and advice given to you as a stockholder as well as the many issues raised by the differing shareholder factions." In his affidavit, Kendall stated: "After the sale of Ferro Mr. Smith's firm rendered a bill for services to my family during 1984 and 1985. Mr. Smith provided tax advice throughout that period but was not retained by me or my family to help sell the Company."

L. Post–Sale Developments

After the sale closed, Offenbecher and Davies became Hoover employees at the same level of compensation they had received at Ferro. Neither JCI nor Hoover paid Offenbecher or Davies any other compensation—cash, stock, or otherwise.

Following the acquisition, Hoover decided to sell one of Ferro's divisions. During August, Hoover received several offers to buy various of its businesses. Citicorp offered to buy six former Hoover divisions and the former VWG and Aerospace divisions, and Hoover accepted Citicorp's offer on August 25, 1985. On August 26, 1985, Hoover and Citicorp executed a letter of intent.

Citicorp formed American Technologies, Inc. ("ATI") to operate two of the former Hoover divisions and VWG and Aerospace. ATI acquired the four divisions on November 7, 1985, and the same day Offenbecher became ATI's Chief Executive Officer and Davies became its Chief Financial Officer. Offenbecher first decided to leave Hoover for ATI on August 26, 1985 when Citicorp offered him a more attractive compensation package, including stock ownership in ATI. Davies continued to be compensated according to his Ferro employment agreement when he joined ATI. Davies never has owned any ATI stock.

After ATI acquired Aerospace, that division's president, James Grimes, resigned, but its head of sales and marketing and its controller remained with the division. Within eighteen months after Hoover acquired Ferro, Automotive's President, Stewart, and its Vice President of Manufacturing, Kendall, resigned. Within three years after ATI acquired VWG, that division's President, Kruske, resigned, and ATI sold the division.

*The Amended Complaint*

The first cause of action charges Offenbecher and Davies with violating Rule 10b–5 through their role in preparing and distributing financial forecasts—including the Sales Forecast and the Supplement—that they allegedly knew understated the Company's future net sales and earnings. By representing to Dillon Read, the board,

Ferro's shareholders, and prospective purchasers that the forecasts were accurate, the Plaintiffs contended, Offenbecher and Davies allegedly caused the shareholders to sell Ferro for substantially less than it was worth.

The second cause of action alleges that Offenbecher and Davies violated Rule 10b–5 by their role in preparing the Proxy Statement and transmitting it to Ferro's shareholders. The Plaintiffs contend that the Proxy Statement omitted the following material facts:

1) Dillon Read's statement to the Ferro Board that Hoover's bid was "on the high end of the fairness range of prices" was based upon a valuation by Dillon Read that failed to account fully for the information in the Supplement or the Consolidated Statements of Earnings for the eight months ending April 30, 1985 included in the Proxy Statement.

2) Ferro's sales and earnings for the eight months ended April 30, 1985 were greater than the forecasts management had submitted to Dillon Read and prospective purchasers, including Hoover.

3) Despite Peter Detwiler's and Bryant's request, management did not ask Dillon Read to value the three divisions separately, and Dillon Read expressed no opinion as to whether Hoover's bid represented a fair price for all three divisions, separately valued.

4) Hutton's bid was not contingent upon investment by Ferro's management, and several Ferro shareholders were prepared to invest the amount Hutton anticipated management would contribute in return for an equity interest in the acquiring Company.

5) Dillon Read never said there was a significant risk that Hutton would not complete the transaction described in Hutton's bid.

6) Neither Ferro's management nor Dillon Read had determined Ferro's value based upon the latest financial statements and the Supplement.

7) The Agreement Hoover executed contained amendments to the previous draft that increased the risks to Ferro should Hoover not complete the acquisition.

8) Dillon Read's fairness opinion was not as broad as the Agreement required.

The third cause of action alleges that Offenbecher's and Davies's misrepresentations and omissions regarding the selling process violated Rule 10b–5. According to the Plaintiffs, Offenbecher and Dillon Read determined to sell the Company as a whole during December 1984 and April 1985. Offenbecher then told the board it would be difficult to sell Automotive separate from VWG and Aerospace, and the board relied upon this representation when it decided to sell Ferro as a whole. The Plaintiffs further contend that Offenbecher and Davies failed to inform the board that the "all or nothing" bidding procedure would not result in the most bids at the highest price.

The fourth cause of action charges Smith with aiding and abetting Offenbecher's and Davies's misrepresentations and omissions concerning the selling process in violation of Rule 10b–5. The Plaintiffs contend that Smith, as a member of Hoover's board, knew that Hoover wanted to acquire only Automotive. By failing to tell the board this information when Offenbecher was claiming it would be difficult to sell Automotive, the Plaintiffs argue, Smith aided and abetted Offenbecher's and Davies's Rule 10b–5 violation.

The fifth cause of action alleges that Offenbecher breached his duty of care as a Ferro officer and director by:

1) providing Dillon Read and the board inaccurate forecasts;

2) failing promptly to furnish Dillon Read the Supplement, contrary to the board's instructions that he do so;

3) failing to establish, require, or recommend procedures to value each of Ferro's divisions separately as a going concern;

4) failing to establish, require, or recommend an auction procedure to sell Ferro through competitive bids for both the Company as a whole and its separate divisions;

5) failing to establish, require, or recommend bidding procedures that would obtain the best possible price for Ferro;

6) misrepresenting to the board the difficulty of selling Automotive individually and the adequacy of soliciting bids only for the Company as a whole;

7) failing to negotiate in good faith the GM contract;

8) failing to evaluate the GM contract's effect on Ferro's value;

9) failing to include the effect of the GM contract in any of the financial forecasts;

10) omitting material facts from the Proxy Statement;

11) opposing an adjournment of Ferro's board meetings to review the bids or the Agreement;

12) failing to recommend that Ferro accept the highest bid;

13) failing to tell the board there was no substantial risk of losing the Hoover bid if the board delayed its decision;

14) completing the acquisition despite Dillon Read's failure to render a fairness opinion that complied with the Agreement.

The sixth cause of action charged Davies with breaching his duty of care as a Ferro officer by:

1) providing Dillon Read and the board inaccurate forecasts;

2) failing to negotiate in good faith the GM contract;

3) failing to evaluate the GM contract's effect on Ferro's value;

4) failing to include the effect of the GM contract in any of the financial forecasts;

5) omitting material facts from the Proxy Statement;

6) failing to establish, require, or recommend procedures to value each of Ferro's divisions separately as a going concern;

7) failing to establish, require, or recommend an auction procedure to sell Ferro through competitive bids for both the Company as a whole and its separate divisions;

8) failing to establish, require, or recommend bidding procedures that would obtain the best possible price for Ferro;

9) failing to recommend that Ferro accept the highest bid;

The seventh cause of action charges Smith with breaching his duty of care as a director and attorney for Ferro by:

1) failing to resign as a director and attorney for Ferro when he knew or should have known Hoover intended to bid for Ferro;

2) failing to disclose to the board Hoover's interest in acquiring Automotive;

3) performing legal services for Hoover, Ferro, and certain shareholder groups during the bidding process;

4) failing to establish, require, or recommend procedures to value each of Ferro's divisions separately as a going concern;

5) failing to establish, require, or recommend an auction procedure to sell Ferro through competitive bids for both the Company as a whole and its separate divisions;

6) failing to establish, require, or recommend bidding procedures that would obtain the best possible price for Ferro;

7) opposing an adjournment to allow the board to review Hoover's bid or the Agreement;

8) failing to recommend that Ferro accept the highest bid;

9) failing to tell the board there was no substantial risk of losing Hoover's bid if the board delayed its decision for several days.

*Conclusions of Law*

A. Propriety of Summary Judgment

 Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir.1988). All ambiguities are resolved against the moving party, and all inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Summary judgment is permissible only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

 However, courts should not be reluctant to grant summary judgment in appropriate cases. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Mieri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct.

91, 88 L.Ed.2d 74 (1985).[9]

■ Rule 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). A genuine issue of fact requiring a trial cannot be raised by statements in affidavits not based on personal knowledge, see *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988), statements in affidavits that conflict with prior deposition testimony, see *Perma Research and Dev. v. Singer Co.*, 410 F.2d 572, 577–78 (2d Cir.1969); *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985), or arguments or statements by counsel unsupported by the record. See *Beyah v. Coughlin*, 789 F.2d 986, 989–90 (2d Cir.1986).

In view of these authorities, the extensive Findings of Fact set forth above raise an obvious question: Is it possible that a sixty-seven page statement of facts contains not a single genuine issue as to a material fact requiring a trial? The affirmative answer lies partly in the nature of the evidence the Plaintiffs have offered to oppose the summary judgment motion and partly in the theory underlying their case.

In opposition to the motion for summary judgment, the Plaintiffs submitted a ninety-seven page Counterstatement of Disputed Facts Pursuant to Local Rule 3(g), seven volumes of exhibits, and affidavits by Peter Detwiler, Bryant, Michael L. Tennican ("Tennican"), Daniel J. Good ("Good"), and Horace J. DePodwin ("DePodwin"). This voluminous record fails in its effort to present through sheer volume a genuine issue as to a material fact in this thoroughly discovered case.[10]

The Plaintiffs' failure to support many of their allegations with evidence from the record perhaps results from the difficulties presented by their underlying theory. At bottom, the Plaintiffs charge Offenbecher, Davies, and Smith with masterminding an elaborate scheme to sell Ferro for substantially less than its fair market value. According to the damages the Plaintiffs seek in this action, Ferro was worth approximately $125.71 more per share than the $87.59 per share Hoover paid.[11]

However, this theory contains a critical flaw: At the time of the sale, Offenbecher and Davies had substantial Ferro holdings —36,000 shares and 12,000 shares, respectively—pursuant to the Equity Plan. By scheming to sell Ferro for substantially less than its fair market value, therefore, Offenbecher deprived himself of an estimated $4.5 million in additional profit and Davies denied himself of about $1.5 million in additional profit.

---

9. Experience has demonstrated the value of the judicious use of summary judgment. In *State Teachers Retirement Board v. Fluor Corporation*, 500 F.Supp. 278 (S.D.N.Y.1980), the plaintiffs sued under Rule 10b–5, and summary judgment was granted for the defendants. The Court of Appeals reversed, discerning a factual issue as to "the non-public nature of the information" at issue. *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 854 (2d Cir.1981). Following an eleven day trial, the jury returned a verdict for the defendants after two hours of deliberation.

Recently, the Supreme Court has reaffirmed the value of pretrial resolution of cases in appropriate circumstances. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As the Supreme Court noted in *Celotex:* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

10. Appendix A* is an analysis of the Plaintiffs' Counterstatement of Disputed Facts demonstrating that the pertinent factual issues the Plaintiffs claim are in dispute are either unsupported by specific facts in the record or not material.

 * Appendix A was deleted for purposes of publication.

11. The Plaintiffs—who owned collectively 238,653 shares at the time of the merger (Amended Complaint ¶ 19)—claim damages amounting to at least $30 million, or $125.71 per share.

The Plaintiffs attempt to explain this flaw as follows:

> Offenbecher knew that if he were successful in arranging a leveraged buy-out at a low price, he would reap windfall profits from the subsequent operations and/or break-up of Ferro. He also knew that if the leveraged buy-out failed and Ferro were sold to a single purchaser, he would be able to obtain immediate cash for his Ferro stock, maintain his position as Chief Executive Officer of the Ferro holding company and remain ready to participate in a leveraged buy-out of Ferro if the opportunity arose later.

Plaintiffs' Mem. at 5–6.

The Plaintiffs' contention that Offenbecher hoped to participate in an LBO ignores the fact that two of the final bids—Hutton's and Citibank's—involved LBOs that would have allowed Offenbecher to make an equity investment. Yet Offenbecher promoted and voted for Hoover's corporate bid, which involved no management equity participation. The Plaintiffs' alternative hypothesis—that Offenbecher was prepared to forfeit a $3.3 million immediate profit so he could "participate in a leveraged buy-out of Ferro if the opportunity arose later"—is without evidentiary or logical support.

Moreover, the Plaintiffs' theory of the case envisions a scheme of such proportions that Offenbecher, Davies, and Smith either duped or obtained the complicity of Dillon Read, Clark Klein, Dickinson Wright, and Touche Ross, as well as a majority of Ferro's directors (including its three outside directors) and shareholders (who themselves had a far greater financial stake in the sale than either Offenbecher or Davies).[12] The Plaintiffs also assume the Defendants perpetrated their plot despite the persistent and vocal opposition of Peter Detwiler and Bryant.

The improbabilities inherent in the theory underlying the Plaintiffs' case makes summary judgment to avoid a lengthy and complicated trial even more compelling. As the Supreme Court has noted:

> [I]f the factual context renders [the Plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[the Plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Supreme Court's pronouncement in *Matsushita* underlies the following analysis.

**B. The Forecasts Were Not so Reckless as to be False and Misleading**

The Plaintiffs' first cause of action alleges that Offenbecher and Davies breached Rule 10b–5 by preparing and distributing the Sales Forecast and the Supplement knowing they understated the Company's future net sales and earnings. To support this claim, the Plaintiffs offer the affidavit of Michael L. Tennican ("Tennican") who serves as Senior Vice President and Director of Temple, Barker & Sloane ("TBS"), a management consulting firm the Plaintiffs retained as an expert in connection with this action.

In his affidavit, Tennican concluded:

> TBS formed the opinion that the Sales Forecast and the [Supplement] (a) substantially underestimated sales and earnings of Ferro's automotive division for the period 1985–1989, (b) were not reasonable or reasonably justified, and (c) were based, in part, on unreasonable assumptions. In addition, it appears that the Sales Forecast and the [Supplement] were not based on a reasonable method of preparation.

---

**12.** However, despite their "deep pockets" and the central role Dillon Read, Touche Ross, Clark Klein, and Dickinson Wright allegedly played in the scheme the Plaintiffs project, the Plaintiffs did not name these institutions as defendants in the conspiracy. "[I]t should be noted that investment advisors hired and paid to evaluate a proposed transaction may themselves be held liable either for a failure to exercise due care in rendering advice or for aiding and abetting a directorial breach of fiduciary duty." D. Block, N. Barton & S. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors and Officers* 12–22 (2d ed. 1988) (*see also* cases cited therein) (hereinafter "Block, at ——").

Based upon Tennican's affidavit, the Plaintiffs contend that the forecasts were "completely unreasonable and reckless," making the following assertions in their memorandum:

(a) The Sales Forecast was based on sales estimates that were at least five months old at the time that it was prepared;

(b) the method used to prepare the Sales Forecast was the same method that had produced unreasonably low one-year sales forecasts for the previous four years;

(c) the Sales Forecast was inconsistent with Ferro's interim monthly financial statements for both the first three months and the first four months of Ferro's 1985 fiscal year;

(d) the Sales Forecast did not take into account numerous factors relating to sales of Ferro's automotive products such as the trend toward increased installation of Ferro's major products in automobiles and light trucks, opportunities for increased sales to current customers, the trend on the part of original equipment manufacturers to "outsource" their parts requirements to suppliers such as Ferro, and new products being developed by Ferro;

(e) the Sales Forecast was inconsistent with the sales forecasts prepared by Ferro's operating division personnel which were substantially higher;

(f) no detailed support for the Sales Forecast existed at the time the Sales Forecast was presented to Ferro's board; the materials prepared as the detailed support for the Sales Forecast were assembled *after* the sales Forecast was presented to Ferro's Board;

(g) the [Supplement] utilized Ferro's interim financial results for fiscal year 1985 to forecast sales for 1985 but did not utilize Ferro's interim financial results to forecast sales for 1986–89 despite the fact that the Sales Forecast for 1986–89 had been based on 1985 sales;

(h) the [Supplement] did not take into account numerous material factors relating to sales of Ferro's automotive products, including those set forth in subparagraph (d), *supra;*

(i) the [Supplement] arbitrarily increased the amounts attributable to several expense accounts without any factual basis for the increases.

Plaintiffs' Mem. at 31–32.

■ Forecasts represent an opinion about what may happen in the future and therefore differ from statements regarding "hard" facts that are knowable at the time they are made. However, forecasts contain implicit representations that they were made in good faith and were based upon a reasonable method of preparation, and those representations constitute "facts" actionable under Rule 10b–5. *See Marx v. Computer Sciences Corp.,* 507 F.2d 485, 490 (9th Cir.1974); Hiler, *The SEC and the Courts' Approach to Disclosure of Earnings, Projections, Asset Appraisals and Other Soft Information: Old Problems, Changing Views,* 46 Md.L.Rev. 1114, 1126 (1987).

■ The "facts" implicit in forecasts, however, are "inextricably linked with the so-called 'scienter' requirement of a private 10b–5 action." *Marx,* 507 F.2d at 490. Accordingly, to establish liability regarding forecasts, a party must show more than mere negligent conduct. *See Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.1985), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958–59, 64 L.Ed.2d 611 (1980) ("the Commission is required to establish scienter as an element of a civil enforcement action to enjoin violations of ... Section 10(b) of the 1934 Act[ ] and Rule 10b–5 promulgated under that section of the 1934 Act"). It must establish that the defendant disseminated the forecasts knowing they were false or that the method of preparation was so egregious as to render their dissemination reckless. *See Eisenberg,* 766 F.2d at 776;

*Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir.1980); *Hahn v. Breed*, 587 F.Supp. 1369, 1379–80 (S.D.N.Y.1984); *see also* Hiler, *Soft Information*, 46 Md.L.Rev. at 1126 n. 40 ("if the basis or method of preparation of the projections is sufficiently unreasonable, that may be an indication of recklessness").

■ The Plaintiffs have criticized the Sales Forecast and the Supplement, but have offered no facts demonstrating that Offenbecher or Davies distributed those projections knowing they were false. To avoid summary judgment on their first cause of action, therefore, the Plaintiffs must establish that a material issue of fact exists regarding whether the method of preparation of the Sales Forecast and the Supplement was so egregious as to render their dissemination reckless.

The process by which Ferro prepared the Sales Forecast and the Supplement—and Offenbecher's and Davies's role in that process—are described in the Findings of Fact. The facts in the record demonstrate that management for each of Ferro's divisions worked with Nelson to prepare the Division Sales Forecasts. Offenbecher conducted a detailed page-by-page review of the Marketing Plans, but that review resulted in no changes, at least to VWG's projections. Nelson used the Marketing Plans and the Division Sales Forecasts to draft the Sales Forecast, then Offenbecher and Davies reviewed the Sales Forecast without influencing or reducing the numbers. During the March Board Meetings, Ferro's board analyzed the Sales Forecast, and Offenbecher and Davies revised the projections in response to the board's comments. The Supplement reflects the board's input. In the process of its review, the board considered Hutton's report criticizing the Sales Forecast.

Nothing in this description demonstrates that the method of preparation was inherently egregious. Moreover, other facts in the record indicate that the projections were reasonable. Dillon Read reviewed the projections and—based upon its review of the Marketing Plans, its internal analysis of Ferro's products, and its interviews with division management—concluded that both the Sales Forecast and the Supplement were reasonable. The board of directors reviewed the Sales Forecast and approved the Supplement. Although he expressed reservations about the timing of its distribution, Peter Detwiler wrote that the figures contained in the Supplement "correctly display the attractiveness of the Company...."

■ The actual results reveal that both the Sales Forecast and the Supplement in fact proved to be optimistic. Aerospace's actual sales were lower than projected in 1985, 1987, and 1988, and VWG's actual sales were lower than anticipated in 1985, 1986, and 1987. In 1985, Automotive's actual sales were higher than the Sales Forecast projected, but lower than the Supplement indicated. In 1986, 1987, and 1988, however, Automotive's actual sales were lower than either the Sales Forecast or the Supplement anticipated.

The Plaintiffs contend that consideration of actual results is improper on this motion. They argue that the schedules setting forth the actual results are inadmissible evidence because "they were prepared especially for this motion," that the actual results prove nothing because new owners acquired the divisions and senior management departed after the acquisition, and that the actual results are irrelevant as a matter of law for assessing the projections' reasonableness because the court must determine liability by examining the circumstances when the forecasts were made.

Here, consideration of the actual results is proper. In support of their motion for summary judgment, the Defendants have submitted the business records from which they derived the actual results. Accordingly, the schedules setting forth each division's actual results are admissible as a summary of business records. *See* Fed.R. Evid. 1006.

The Plaintiffs have identified no facts indicating that the sale of Ferro's divisions and subsequent management turnover altered the divisions' operations in such a way as to invalidate a comparison between the actual results and the projections con-

tained in the Sales Forecast and the Supplement. Throughout their complaint, the Plaintiffs argue that Ferro's divisions were free-standing businesses that should have been sold separately. The Plaintiffs cite no facts to indicate that Hoover, Citibank, or ATI changed these businesses' operations in ways that affected the sales figures.

Moreover, the Plaintiffs describe management turnover, but point to no facts demonstrating that the changes in management disrupted the divisions' operations. In fact, the turnover appears to have been orderly. Stewart, Automotive's president, remained with the Company for eighteen months following the sale. Offenbecher and Davies joined ATI and continued heading VWG and Aerospace. Kruske, VWG's president, remained with that division for three years. Aerospace lost Grimes, its president, following the sale to ATI, but the division's head of sales and marketing and its controller remain with the company today.

In assessing the reasonableness of the method of preparing forecasts, evidence regarding the circumstances at the time is important. However, courts also have considered actual results, particularly where those results proved exculpatory. *See, e.g.,* *Schwartz v. Novo Indus., A/S,* 658 F.Supp. 795, 799–800 (S.D.N.Y.1987) (finding that allegedly misleading projections did not support an inference of fraud, in part because the predictions at issue "turned out to be true"); *Quintel Corp., N.V. v. Citibank, N.A.,* 596 F.Supp. 797, 804 (S.D.N.Y. 1984) (admitting post-closing evidence as to discrepancies between the projections and the results in an action predicated on allegedly inflated earnings projections); *Dolgow v. Anderson,* 53 F.R.D. 664, 678 (E.D.N.Y. 1971) (finding no likelihood of success in a class action predicated on a forecast where

"the statements and estimates cited by plaintiff in their analysis ... were fully borne out by actual results), *aff'd,* 464 F.2d 437 (2d Cir.1972); *Connellan v. Himelhoch,* 506 F.Supp. 1290, 1299 (E.D.Mich. 1981) (dismissing allegation that earnings forecast was misleading, in part because "the court was not even informed how far [defendant's] projections fell below the reality. With no basis upon which to judge the accuracy of the projections, the court cannot find ... that [defendant] possessed scienter.").

As noted above, at issue is whether the method of preparing the Sales Forecast and the Supplement was so egregious as to render Offenbecher's and Davies's distribution of those projections reckless. The record contains evidence that Dillon Read's due diligence convinced it that both the Sales Forecast and the Supplement were reasonable, that the board of directors reviewed the Sales Forecast and approved the Supplement, that Peter Detwiler believed the Supplement "correctly displayed the attractiveness of the Company," and that the actual results proved that the projections in fact were optimistic. Against these facts, the Plaintiffs offer their expert's opinion that "it appears that the Sales Forecast and [the Supplement] were not based on a reasonable method of preparation," and they contend that this opinion raises an issue of fact sufficient to defeat summary judgment.

■ Courts can consider expert opinions on summary judgment motions, provided they meet the requirements of Rules 702 [13] and 703 [14] of the Federal Rules of Evidence. *See Bulthuis v. Rexall Corp.,* 789 F.2d 1315 (9th Cir.1985). However, several courts have recognized that expert opinions create potential difficulties in the summary

**13.** Rule 702 provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

**14.** Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703.

judgment context. For example, the Court of Appeals for the District of Columbia Circuit has noted that Rule 703 "was intended to broaden the acceptable bases of expert opinions, but it was not intended ... to make summary judgment impossible whenever a party has produced an expert to support its position." *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977). Similarly, the Ninth Circuit has said: "We have difficulty with the notion that to state an opinion is to set forth specific facts." *United States v. Various Slot Machines On Guam*, 658 F.2d 697, 700 (9th Cir.1981).

Accordingly, courts have recognized that summary judgment is appropriate where the nonmoving party relies solely on an expert opinion that is not based upon specific facts, *see id.* at 700–01, or that makes unsupported assumptions or ignores important facts. *See Merit Motors*, 569 F.2d at 672–73. Recently, the Second Circuit recognized that an expert opinion may be insufficient to defeat summary judgment in some circumstances. In one of the *Agent Orange* cases, the Court noted:

> A court addressing a motion for summary judgment based on the military contractor defense must ... look to the weight of scientific evidence in determining the existence of a hazard triggering the duty to inform. The hazard cannot be established by mere speculation or idiosyncratic opinion, *even if that opinion is held by one who qualifies as an expert under Fed.R.Evid. 702.*

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir.1987) (emphasis added), *cert. denied*, —— U.S. ——, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

Here, Tennican's expert opinion fails to raise a material issue of fact defeating summary judgment. There are ample undisputed facts demonstrating that the Sales Forecast and the Supplement were prepared in a reasonable manner. The only evidence to indicate otherwise is Tennican's opinion that the projections "were not based on a reasonable method of preparation." However, Tennican offers no conclusion regarding the essential fact at issue—whether the manner of preparation was egregious. As noted above, it is not enough for the Plaintiffs to establish that the method of preparation simply was unreasonable. Rule 10b–5's scienter requirement demands that the method of preparing the projections be so egregious as to render their dissemination reckless.

Moreover, Tennican's analysis indicates that the manner of preparation at issue here hardly can be characterized as "egregious." Tennican identified additional considerations that would have increased the projected sales by a cumulative $122.9 million over five years—a total of nine percent—with two-thirds of the added sales hypothesized to occur in the final two years of the forecasts, which Tennican conceded in his deposition are the most speculative sales. Failure to include additional sales amounting to a nine percent difference over five years cannot be said to be the product of an "egregious" method of preparation.

The Plaintiffs cannot raise a genuine issue of fact by relying solely on Tennican's expert opinion. Accordingly, the Defendants are granted summary judgment dismissing the Rule 10b–5 claims regarding allegedly false forecasts.

### C. The Proxy Statement Was Not Misleading

The second cause of action alleges that Offenbecher and Davies violated Rule 10b–5 by their role in preparing and distributing a Proxy Statement that omitted various material facts. Summary judgment dismissing this claim is appropriate because each of the alleged omissions has no basis in fact, is not material as a matter of law, or involves a nondisclosure not actionable under Rule 10b–5.

#### 1. Alleged Omissions Having No Basis In Fact

The Plaintiffs contend that the Proxy Statement failed to disclose that "Dillon Read was instructed by Offenbecher to locate a buyer for Ferro as a whole, rather than its separate businesses, and neither Offenbecher nor Dillon Read ever attempt-

ed to separately sell each of Ferro's individual businesses." Plaintiffs' Mem. at 50. The Plaintiffs offer no facts to support this allegation. Moreover, the facts in the record indicate that Dillon Read, not Offenbecher, selected the method for marketing Ferro, and that Dillon Read attempted to sell Ferro piecemeal, although it advised those companies who wanted to buy only part of Ferro that bids for the Company as a whole had a better chance of succeeding because of the tax implications of selling the Company piecemeal. The proof that Dillon Read was attempting to sell Ferro's components rests in the fact that Dillon Read received seven indications of value for Ferro's separate divisions in March 1985.

The amended complaint alleges that the Proxy Statement failed to state that "Dillon Read had expressed no opinion whatsoever on whether or not the Hoover Bid was a 'fair' price for all three divisions, separately valued." ¶ 104(c). The Plaintiffs offer no facts to support this allegation. In fact, the fairness opinion Dillon Read appended to the Proxy Statement said Hoover's bid was "fair ... from a financial point of view," and Dillon Read's affidavit stated that the firm "tested the value of the Company as a whole *and of its individual divisions* in the best of all ways, by asking purchasers what they would pay." (Emphasis added).

According to the Plaintiffs, the Proxy Statement also omitted to tell Ferro's shareholders that "The Hutton Bid was not contingent upon any investment by Ferro's management...." Amended Complaint ¶ 104(d). The Proxy Statement in fact stated that "the financial exhibits to Hutton's bid contemplated that Ferro's Management Group would contribute $1,457,000 to the capital of the acquiring firm," but that "the Board was orally informed during the [June 5, 1985 board] meeting that Hutton would proceed with its bid despite Ferro's management's unwillingness to invest in the Hutton transaction."

■ In addition, the Plaintiffs appear to concede this contention. Although the Defendants in their memorandum in support

of this motion stated that this allegation had no factual basis, the Plaintiffs offered no response in their opposing memorandum and neglected to identify this allegation as one of the allegedly misleading omissions charged in the second cause of action. By their silence, the Plaintiffs have failed to present any "significant probative evidence tending to support the complaint." *First Nat'l City Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

The amended complaint further contends that the Proxy Statement failed to indicate that "Dillon Read never stated that there was any significant risk that Hutton would not complete the transaction described in the Hutton Bid." Amended Complaint ¶ 104(e). The Proxy Statement in fact included a detailed description of the risks inherent in Hutton's LBO, concerns Dillon Read had voiced at the board's June 5, 1985 meeting. Again, the Plaintiffs' opposing memorandum remained silent regarding this contention. *See First Nat'l City Bank*, 391 U.S. at 290, 88 S.Ct. at 1593.

The Plaintiffs assert that the Proxy Statement also failed to disclose that prospective purchasers had received the Sales Forecast and the Supplement, which "had been prepared by Offenbecher and Davies in an entirely unreasonable and reckless manner." Plaintiffs' Mem. at 50. The facts concerning the reasonableness of the financial forecasts have been addressed above.

### 2. The Alleged Omissions Are Not Material As A Matter of Law

■ The amended complaint alleges that the Proxy Statement failed to disclose that "The Reorganization Agreement contained numerous additions to and changes from the draft of the agreement which had been prepared by Ferro's counsel and these additions and changes materially increased the risks to Ferro in the event that [Hoover] did not complete the Merger." Amended Complaint ¶ 104(g). The Findings of Fact summarize the differences between the Agreement and an earlier draft. These revisions were minor, and no reason-

able jury could conclude that "a reasonable [shareholder] would consider [them] important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Moreover, the Plaintiffs' opposing memorandum remained silent regarding this issue. *See First Nat'l City Bank*, 391 U.S. at 290, 88 S.Ct. at 1593.

The amended complaint further contends that the Proxy Statement omitted to state that "The Fairness Opinion was not as broad as the opinion to be given by Dillon Read that was required by the Reorganization Agreement as a condition of the Merger." Amended Complaint ¶ 104(h). The Agreement contemplated a Dillon Read opinion that "the terms of the merger are fair and reasonable to Ferro and its shareholders." The opinion Dillon Read actually provided—in language standard in the investment banking industry—stated that the "cash consideration to be received by holders of Common Stock in the merger is fair from a financial point of view." No reasonable jury comparing these two versions could find that "a reasonable [shareholder] would consider [the differences] important in deciding how to vote." *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132. The Plaintiffs' opposing memorandum again remained silent regarding this issue. *See First Nat'l City Bank*, 391 U.S. at 290, 88 S.Ct. at 1593.

### 3. The Alleged Omissions Are Not Actionable Under Rule 10b-5

In *Santa Fe Industries, Inc. v. Green*, the Supreme Court ruled that Congress did not intend for the antifraud provisions of the securities laws to "federalize" state corporate law. 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). Accordingly, it refused to construe Section 10(b) to prohibit "instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Id.* at 477, 97 S.Ct. at 1303. The Court limited Section 10(b)'s application instead to conduct involving "manipulation" or "deception," defining manipulation as "practices, such as

wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activities," *id.* at 476, 97 S.Ct. at 1302, and deception as "misrepresentation, or nondisclosure" intended to deceive. *Id.*

The Second Circuit recently analyzed its decisions since the Supreme Court decided *Santa Fe*, observing:

> We believe the following line to be drawn by our cases. Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws.... But where the remedy of an injunction is needed (and is available under state law) to prevent irreparable injury to the company from willful misconduct of a self-serving nature, disclosure of facts necessary to make other statements not misleading is required where the misleading statements will lull shareholders into foregoing the injunctive remedy.

*Field v. Trump*, 850 F.2d 938, 948 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).

Claims regarding "garden-variety mismanagement," the Court reasoned, "[c]ertainly" fall within the former group and are barred by *Santa Fe*'s principles. *Id.* The Court offered several examples of "garden-variety mismanagement" claims, including allegations that managers failed to "maximiz[e] value for ... shareholders," that they neglected "to adequately inform themselves," and that they "acted in a generally self-entrenching fashion." *Id.* In general, the Court noted, facts requiring a court "to distinguish between conduct that is 'reasonable' and 'unreasonable,' or 'informed' and 'uninformed,' [involve] distinctions that are the hallmark of state fiduciary law." *Id.*

In their memorandum, the Plaintiffs assert that the Proxy Statement neglected to disclose that:

1) Dillon Read failed to contact a number of foreign owned companies that were prospective purchasers of Ferro.

2) The majority of Ferro's Board, including Offenbecher and Smith, did not make any independent assessment of Ferro's fair market value despite the fact that it was their duty and obligation to make such a valuation before accepting Hoover's bid.

3) Neither the Special Committee of Ferro's Board nor the Board itself did any due diligence or asked any questions of Dillon Read's oral fairness opinion prior to accepting Hoover's bid.

Plaintiffs' Mem. at 48–50.

■ Applying *Santa Fe* and *Field,* none of these allegations is actionable under Rule 10b–5. The omission regarding Dillon Read's purported failure to contact additional foreign purchasers assumes that Dillon Read somehow acted "unreasonably" when it limited the auction to seventy prospective bidders. Whether Dillon Read properly defined the scope of the auction when it decided which possible purchasers to contact is nothing more than "garden-variety mismanagement." Similarly, the directors' purported failure to assess Ferro's fair market value independently, to conduct due diligence, and to question Dillon Read regarding its fairness opinion amounts to no more than a failure "to adequately inform themselves," which *Field* expressly recognized as beyond Rule 10b–5's scope. *Field,* 850 F.2d at 948.[15]

■ In their amended complaint, the Plaintiffs also contend that Offenbecher and Davies improperly omitted the following facts from the Proxy Statement:

(a) Dillon Read's statement to the Ferro Board that the Hoover Bid was "on the high end of the fairness range of prices" was based upon a valuation by Dillon Read that did not fully take into account either the Second Revised Forecast or the Consolidated Statements of Earnings for the eight months ending April 30, 1985 included in the Proxy Statement;

(b) Ferro's sales and earnings for the eight months ended April 30, 1985 were greater than the sales and earnings included in the forecasts which had been submitted by management to Dillon Read and prospective purchasers, including Hoover;

\* \* \* \* \* \*

(f) Neither Ferro's management nor Dillon Read had determined the true value of Ferro based upon the latest financial statements and the Second Revised Forecast.

Amended Complaint ¶¶ 104(a), (b), and (f). At bottom, each of these allegations turns on the Plaintiffs' contention that the selling process was flawed to the extent that management, Dillon Read, and prospective bidders acted on the basis of six-month financial statements (which the Supplement contained) rather than eight-month financial statements (which the Proxy Statement included).

These alleged omissions do not support a cause of action under Rule 10b–5. The assertion that the Proxy Statement should have disclosed that management, Dillon Read, and the final bidders neglected to obtain financial statements reflecting the two latest months involves at most an allegation that these parties failed to inform themselves. As noted above, Rule 10b–5 claims that fiduciaries failed to inform themselves are not actionable under *Santa Fe* and *Field.*

■ Moreover, the additional information that management, Dillon Read, or the final bidders could have extracted from the actual results for two additional months is not material as a matter of law. In valuing the Company, Dillon Read and the final bidders drew upon their due diligence and the information contained in the Supplement (including the six-month results and the five-year sales forecasts), which Peter Detwiler said correctly displayed the Company's performance. No reasonable jury could find that shareholders would consider

**15.** The fact that the Plaintiffs' fiduciary duty claims seek recovery for precisely this misconduct, *see* Plaintiffs' Mem. at 64–66, supports the conclusion that these allegations are not actionable under Rule 10b–5. Additional problems with these allegations are discussed below in the section dismissing the Plaintiffs' state law claims.

the failure to incorporate the latest two months important in deciding how to vote. *See TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

Finally, even though the Proxy Statement omitted to indicate that the selling process reflected the six-month—but not the eight-month—results, the shareholders had this information available to them when they voted to accept Hoover's bid. The shareholders received the eight-month results with the Proxy Statement. At the July 25, 1985 shareholders' meeting, Peter Detwiler explained the difference between the Sales Forecast and the Supplement and informed the shareholders that Dillon Read had distributed the Supplement to prospective bidders in April 1985. Thus, the shareholders knew that the final bids reflected the Supplement, that the Supplement contained the six-month results, and that the eight-month results were available at that time. *See Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir.1986).

Accordingly, the Defendants are granted summary judgment dismissing the Rule 10b–5 claims regarding alleged omissions from the Proxy Statement.

### D. No Misrepresentations Were Made or Relied Upon in Connection With the Selling Process

The third cause of action alleges that Offenbecher's and Davies's misrepresentations regarding the selling process violated Rule 10b–5. In particular, the Plaintiffs contend that Offenbecher and Davies convinced Ferro's board to sell the Company as a whole rather than piecemeal by 1) misrepresenting that Dillon Read was soliciting prospective purchasers when in fact the firm allegedly was marketing the Company on an "all or nothing" basis; 2) misrepresenting the likelihood of finding a buyer for Automotive; and 3) misrepresenting the tax implications of selling Ferro piecemeal. The fourth cause of action alleges that Smith aided and abetted Offenbecher's and Davies's misrepresentations by failing to tell the board Hoover wanted to acquire only Automotive.

The record does not support these allegations. However, even assuming Offenbecher and Davies made these alleged misrepresentations, summary judgment dismissing the third cause of action is appropriate because the Plaintiffs cannot prove that the board relied on Offenbecher and Davies when it decided to sell the Company as a whole. Moreover, summary judgment dismissing the aiding and abetting cause of action against Smith is proper because the Plaintiffs offer no facts indicating that Smith knew Hoover's acquisition plans.

■ Courts traditionally have made reliance a prerequisite for recovery in Rule 10b–5 actions to "certify that the conduct of the defendant actually caused the plaintiff's injury." *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *see also Panzirer v. Wolf*, 663 F.2d 365, 367 (2d Cir.1981) ("The function of requiring the plaintiff to show reliance in a 10b–5 action is to permit only those injured by fraud to sue."), *vacated as moot sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). Summary judgment is appropriate where the plaintiff fails to produce facts demonstrating reliance. *See State Teachers Retirement Bd. v. Fluor*, 654 F.2d 843, 853 (2d Cir.1981).

Courts apply Rule 10b–5's reliance requirement differently in cases involving a failure to disclose ("omission cases") than in cases involving affirmative misstatements ("misrepresentation cases"). *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 n. 6 (2d Cir.1981).

■ In omission cases, materiality creates a presumption of reliance. As the Supreme Court has stated:

Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.... This obligation to disclose and this withhold-

ing of a material fact establish the requisite element of causation in fact.

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). The Second Circuit has noted that "such a presumption is appropriate because 'in instances of total nondisclosure, … it is of course impossible to demonstrate reliance.'" *Du Pont v. Brady,* 828 F.2d 75, 78 (2d Cir.1987) (quoting *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975)).

In misrepresentation cases, however, reliance remains an essential element of the plaintiff's case, even if the plaintiff establishes materiality. *See Fluor,* 654 F.2d at 853; *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 33 (2d Cir.1976). A plaintiff seeking to recover for the defendant's affirmative misstatement "is not required to establish that the defendant's act was the sole and exclusive cause of his injury; he need only prove that it was '"substantial;" *i.e.,* a significant contributing cause.'" *Wilson* 648 F.2d at 92 (quoting *Herzfeld,* 540 F.2d at 34); *see also Panzirer,* 663 F.2d at 367 ("If plaintiff can link her injury to defendant's fraud by showing the fraud was a 'substantial' or 'significant contributing cause,' plaintiff has shown sufficient reliance to support her 10b–5 claim.").

Finally, the Second Circuit repeatedly has recognized that access to the truth bars a claim of reliance upon purported misrepresentations. *See, e.g., Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984); *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 282 (2d Cir.1975).

Here, the Plaintiffs' 10b–5 claims regarding the selling process relate primarily to alleged misstatements, not omissions.[16] Accordingly, to avoid summary judgment the Plaintiffs must establish that a genuine issue of fact exists regarding whether Offenbecher's and Davies's statements concerning the selling process were a substantial or significant contributing cause of the board's decision to sell Ferro as a whole. This they cannot do.

At its March 6, 1985 meeting, Ferro's board unanimously adopted a resolution to have Touche Ross, Clark Klein, and Dillon Read advise the board regarding the desirability of selling the Company's divisions. In response, representatives from these firms prepared a presentation recommending that the board sell Ferro as a whole, not piecemeal.

At the board's March 14, 1985 meeting, Touche Ross presented a memorandum to Ferro's board detailing the tax and accounting difficulties associated with selling Ferro's components. Dillon Read reported that it was receiving indications of value for the Company as a whole as well as for individual divisions, and it stated that it believed the shareholders would get more if they sold the Company as a whole. One of the outside directors testified at his deposition that the tax implications of a piecemeal sale and the fact that Dillon Read was receiving offers to buy the whole company convinced him that it would be better to sell the Company as a whole.

At the same time, Peter Detwiler was urging Ferro's board to sell the Company piecemeal. At a March 13, 1985 meeting, Peter Detwiler and two Hutton representatives presented a Hutton report to the special committee setting forth their opinion regarding how to sell Ferro. The next day,

**16.** Any effort to portray Offenbecher's and Davies's actions as "omissions" rather than "misrepresentations" must be unavailing. In distinguishing between omission and misrepresentation cases, the Second Circuit has noted:

> The labels by themselves … are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute,* in which no positive

statements exist: reliance as a practical matter is impossible to prove.

*Wilson,* 648 F.2d at 93. This is not a case in which "no positive statements exist"—the Plaintiffs' principal grievance is that Offenbecher and Davies told Ferro's board certain things upon which the board relied. Accordingly, reliance as a practical matter is possible to prove in this case.

Peter Detwiler presented that information to the full board.

Plaintiffs cite no evidence indicating that Offenbecher's and Davies's alleged misstatements regarding the selling process represented a substantial or significant cause of the board's decision to sell the Company as a whole. In fact, Ferro's board sought, received, and implemented the advice of Dillon Read, Touche Ross, and Clark Klein on that very issue. In deciding to sell the Company as a whole, Ferro's board relied primarily on its accounting, financial, and legal advisors, not on Offenbecher's and Davies's statements. Moreover, the board reached this decision despite Peter Detwiler's and Hutton's recommendations.

■ The Plaintiffs also offer no evidence supporting their claim that Smith aided and abetted Offenbecher's and Davies's alleged Rule 10b–5 violation by failing to tell Ferro's board about Hoover's purported interest in acquiring only Automotive. According to Smith, he had no knowledge that Hoover had any interest in acquiring only Automotive when he resigned from Hoover's board on March 14, 1985, and he did not discuss the Ferro acquisition with Hoover after his resignation. To the extent Smith may have speculated regarding Hoover's interest in acquiring Automotive, he had no obligation to reveal that speculation to Ferro's board. *See Reiss v. Pan Amer. World Airways*, 711 F.2d 11, 14 (2d Cir.1983).

Accordingly, summary judgment is granted dismissing the Plaintiffs' Rule 10b–5 claims regarding the selling process.

E. Breaches of Fiduciary Duty Under State Law

The amended complaint's fifth, sixth, and seventh causes of action detail numerous ways in which Offenbecher, Davies, and Smith allegedly breached the duty of care they owed Ferro and its shareholders under Michigan law. The Plaintiffs' Memorandum lists these purported breaches as follows:

*Offenbecher*

1. Preparing the false and misleading [Sales Forecast and Supplement].
2. Omitting numerous material facts from the Proxy Statement.
3. Determining to sell Ferro to a single purchaser without the informed consent of the Board.
4. Misrepresenting to the Board the method used to solicit purchasers of Ferro.
5. Misrepresenting to the Board the salability of Ferro's Automotive Division.
6. Failing to obtain independent advice concerning whether Ferro's shareholders would receive the highest possible price in a sale from the separate sale of Ferro's separate divisions.
7. Determining to sell Ferro via a single, sealed bid without any opportunity for Ferro to conduct an auction for its business.
8. Failing to inquire into the factual basis for Dillon Read's fairness opinions.
9. Failing to make an independent determination of Ferro's fair market value, based on Ferro's then-existing financial condition, before voting to accept the Hoover bid.
10. Preventing Peter Detwiler and John Bryant from obtaining independent advice, as directors, concerning the bids submitted for Ferro.

*Davies*

1. Preparing the false and misleading Sales and Financial Forecasts.
2. Omitting numerous material facts from the Proxy Statement.
3. Failing to disclose to the Board material facts concerning certain tax issues relied upon by the Board in determining whether Ferro should separately sell its businesses.

*Smith*

1. Failing to disclose to the Board certain facts concerning the salability of Ferro's Automotive Division.
2. Failing to obtain independent advice concerning whether Ferro's share-

holders would receive the highest possible price in a sale from the separate sale of Ferro's separate divisions.

3. Adopting a procedure to sell Ferro via a single, sealed bid without any opportunity for Ferro to conduct an auction for its businesses.

4. Failing to inquire into the factual basis for Dillon Read's fairness opinions.

5. Failing to make an independent determination of Ferro's fair market value before voting to accept the Hoover bid.

6. Preventing Peter Detwiler and John Bryant from obtaining independent advice, as directors, concerning the bids submitted for Ferro.

7. Secretly representing a majority block of Ferro's shareholders in connection with the sale of Ferro.

8. Failing to disclose that, as a co-trustee of a trust that owned shares of Ferro stock, he believed that the trust's need for liquidity overrode all other considerations in determining whether Ferro should be sold.

Plaintiffs' Mem. at 64–66.

The defendants' contend that the business judgment rule protects the business decisions they made in the course of selling Ferro.

### 1. Pendent Jurisdiction

■ In general, federal courts should abstain from exercising jurisdiction over pendent state law claims once they have dismissed the federal claims, unless retaining jurisdiction to determine the pendent claims is warranted by "considerations of judicial economy, convenience and fairness to litigants." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

■ The Plaintiffs commenced this litigation in September 1986. Since then, the court has overseen the parties' thorough discovery, conducted numerous conferences, and gained knowledge of the issues involved. The parties have expended considerable time and resources preparing and responding to the instant summary judgment motion. Moreover, the parties' submissions on summary judgment reveal that "[m]any issues critical to [the Plaintiffs'] state law claims ... overlap considerably with the issues central to [their federal claims]." *Walker*, 784 F.2d at 53. Under these circumstances, "considerations of judicial economy, convenience and fairness to litigants" support retaining jurisdiction to determine the pendent state law claims. *United Mine Workers*, 383 U.S. at 726, 86 S.Ct. at 1139.

### 2. The Duty of Care and the Business Judgment Rule [17]

■ Officers and directors bear responsibility for managing the corporation's business and affairs. *See Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984). In doing so, they owe a fiduciary duty of care to the Company and its shareholders. *See Production Finishing Corp. v. Shields*, 158 Mich.App. 479, 405 N.W.2d 171, 174 (1987), *appeal denied*, 430 Mich. 859 (Mich.), *cert. denied*, —— U.S. ——, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988); *Plaza Sec. Co. v. Fruehauf Corp.*, 643 F.Supp. 1535, 1542 (E.D.

---

**17.** A federal court adjudicating state law claims must apply the forum state's choice of law principles. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Peters v. MCI Telecommunications Corp.*, 685 F.Supp. 411, 412 (S.D.N.Y.1988). Under New York choice of law principles, the proper law to apply in the instant case is the law of the state of incorporation. *See Lewis v. Dicker*, 118 Misc.2d 28, 459 N.Y.S.2d 215 (N.Y.Sup. Ct.1982). Because Ferro was a Michigan corporation, Michigan law governs the Plaintiffs' claims for breach of fiduciary duty. *See Burks v. Lasker*, 441 U.S. 471, 475–77, 99 S.Ct. 1831, 1835–37, 60 L.Ed.2d 404 (1979); *Santa Fe Indus. v. Green*, 430 U.S. 462, 478–79, 97 S.Ct. 1292, 1303–04, 51 L.Ed.2d 480 (1977); *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975). In the absence of a controlling precedent for a particular issue, Michigan courts look to Delaware law as a guide for adjudicating matters involving corporate law. *See Russ v. Federal Mogul Corp.*, 112 Mich.App. 449, 316 N.W.2d 454, 457 n. 1 (1982).

Mich.1986); *Berman v. Gerber Prod. Co.,* 454 F.Supp. 1310, 1319 (E.D.Mich.1978). Michigan has codified the duty of care in Section 1541 of the Michigan Business Corporation Law, which provides: "[a] director or an officer shall discharge the duties of that position in good faith and with that degree of diligence, care and skill which an ordinarily prudent man would exercise under similar circumstances in a like position." Mich.Corp.Laws Ann. § 450.1541(1) (West Supp.1988). This provision makes officers and directors of a Michigan corporation liable for "ordinary neglect." *See Christner v. Anderson, Nietzke & Co., P.C.,* 156 Mich.App. 330, 401 N.W.2d 641, 646 (1986); *Detroit Gray Iron & Steel Foundaries, Inc. v. Martin,* 362 Mich. 205, 106 N.W.2d 793, 795 (1961); *Dykema v. Muskegon Piston Ring Co.,* 348 Mich. 129, 82 N.W.2d 467, 471 (1957); *Reed v. Burton,* 344 Mich. 126, 73 N.W.2d 333, 336 (1955); *Martin v. Hardy,* 251 Mich. 413, 232 N.W. 197 (1930).

Courts are ill-equipped to review a business decision's merits, and they fear that such oversight may interfere with "the full and free exercise of the ... power granted to [a corporation's management]." *Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del. 1985). To accommodate these concerns, courts apply the business judgment rule when assessing a shareholder suit challenging a business decision as a breach of the officers' and directors' duty of care. *See id.; accord Aronson,* 473 A.2d at 812 ("The business judgment rule is an acknowledgement of the managerial prerogatives ....").

The business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *Aronson,* 473 A.2d at 812; *see also Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988); *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1341 (Del.1987). Courts have found the business judgment applicable to decisions taken in the takeover context. *See, e.g., Ivanhoe,* 535 A.2d at 1341;

*Unocol Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

▮▮▮ Chancellor Allen recently articulated the prerequisites determining whether the business judgment rule applies:

> The business judgment form of judicial review encompasses three elements: a threshold review of the objective financial interests of the board whose decision is under attack (*i.e.,* independence), a review of the board's subjective motivation (*i.e.,* good faith), and an objective review of the process by which it reached the decision under review (*i.e.,* due care).

*In re RJR Nabisco, Inc. Shareholders Litig.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,194, at 91,709, 1989 WL 7036 (Del.Ch.) (citing *Polk v. Good,* 507 A.2d 531 (Del. 1986), *appeal denied,* 556 A.2d 1070 (Del. 1989); *Aronson,* 473 A.2d at 805; *Smith,* 488 A.2d at 858; *Grobow,* 539 A.2d at 180); *see generally* Block, at 12–22 (describing the five elements of the business judgment rule as a business decision, disinterestedness, due care, good faith, and no abuse of discretion). Courts presume that the business judgment rule applies, and the shareholders challenging a business decision bear the burden of establishing that the prerequisites to the business judgment rule are absent. *See Aronson,* 473 A.2d at 812; Block, at 12.

### 3. The Business Judgment Rule's Application Here

The Plaintiffs argue that the prerequisites to the business judgment rule are absent here because the Defendants acted out of self-interest, acted in bad faith by making intentional misrepresentations or omissions to the board or shareholders, and failed to fulfill their duty to inform themselves during the selling process.

#### a. Independence

▮▮▮ The business judgment rule protects only business decisions reached by disinterested officers and directors. *See Grobow,* 539 A.2d at 187; *Unocal,* 493 A.2d at 958; *Aronson,* 473 A.2d at 812. According to the Delaware Supreme Court, "this means that directors can neither appear on both sides of a transaction nor

expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812; *see also Grobow*, 539 A.2d at 188. Directors also may not claim the business judgment rule's protection if their "sole or primary purpose [in taking the challenged action] was retention of control." *Johnson v. Trueblood*, 629 F.2d 287, 292 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *accord Enterra Corp. v. SGS Assocs.*, 600 F.Supp. 678, 686 (E.D. Pa.1985). However, the fact that "certain board members are large stockholders ... alone does not create a disqualifying 'personal pecuniary interest' to defeat the operation of the business judgment rule." *Unocal*, 493 A.2d at 958 (quoting *Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548, 554 (1964)). The business judgment rule still will apply even though the business decision involved some interested directors, provided the directors' interest is known or disclosed and a majority of disinterested directors approved the transaction. *See* Mich.Comp.Laws Ann. § 450.1545 (West Supp.1988); *Aronson*, 473 A.2d at 812.

The Plaintiffs contend that the Defendants are not entitled to the business judgment rule's protection because they were not disinterested participants in the decision to sell Ferro. According to the Plaintiffs, Offenbecher had expressed a desire to participate in an LBO and wanted to continue his employment following the sale, Davies acted out of a desire to maintain his position with Ferro, and Smith represented the Harriett Devereaux trust (which purportedly had a need for liquidity), as well as a majority of the shareholders.

■ None of these alleged interests is sufficient to bar the business judgment rule's application. Offenbecher's purported desire to participate in an LBO is irrelevant because the transaction he favored involved a corporate sale, not an LBO. Moreover, the fact that Offenbecher preferred Hoover's bid over two competing LBOs undermines the Plaintiffs' argument that Offenbecher was motivated by a wish to participate in an LBO.

■ In support of their contention that Offenbecher and Davies acted out of a desire to protect their jobs, the Plaintiffs state:

[B]oth Offenbecher's and Davies' future employment opportunities depended, in large part, upon what company acquired Ferro. In a confidential memorandum, Hoover noted that the 'interests of management' was one factor that Ferro would consider in determining which bid to accept.

Plaintiffs' Mem. at 74. These allegations are insufficient to meet the Plaintiffs' burden on this issue. The Plaintiffs offer no evidence that Offenbecher's or Davies's *sole or primary motive* in approving the sale was to protect their future employment. *See Johnson*, 629 F.2d at 292; *Enterra*, 600 F.Supp. at 686. Both Offenbecher and Davies had short-term employment contracts, and the Hoover transaction involved no provision for longer-term employment guarantees. Moreover, had Offenbecher and Davies been driven solely or primarily by a desire to secure their jobs, it would have made more sense for them to favor an LBO bid allowing for management equity participation rather than a corporate bid.

■ The fact that Smith represented a majority of shareholders is not the sort of interest to deny him the business judgment rule's protection. The shareholders Smith represented hoped to obtain the best transaction available. In this respect, their interest—and Smith's goal as their representative—was no different from the interest of "all stockholders generally." *Aronson*, 473 A.2d at 812.

■ Even assuming the Plaintiffs could establish the elements of self-interest they allege, however, the business judgment rule still would apply because a majority of the disinterested directors on the board approved the Hoover bid. Of Ferro's nine directors, five disinterested directors—including three outside directors and two shareholder representatives—supported Hoover's bid.

### b. Good Faith

■ The business judgment rule also requires that officers and directors act "in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow*, 539 A.2d at 187. According to the *Citron* court, "the absence of significant financial adverse interest creates a presumption of good faith," although the good faith requirement further demands "an *ad hoc* determination of the board's motives" in making the business decision. *Citron v. Fairchild Camera and Instrument Corp.*, [Current] Fed.Sec. L.Rep. ¶ 93,915, at 90,102, 1988 WL 53322 (Del.Ch.1988).

The Plaintiffs offer no evidence that the Defendants had a "significant financial adverse interest" in selling Ferro. In fact, both Offenbecher and Davies were Ferro shareholders and therefore had the same financial interest as the Plaintiffs—to obtain the best transaction available.

■ The Plaintiffs' contend, however, that the Defendants' purported misrepresentations and omissions evidence a bad motive. The Defendants' alleged misrepresentations and omissions have been dealt with in detail above. As discussed, the misrepresentations and omissions are not actionable because the Plaintiffs' allegations are not supported by the record or because the alleged statements or omissions were not relied upon, were immaterial as a matter of law, or involved a failure to disclose a purported breach of fiduciary duty. Accordingly, the Plaintiffs' cannot point to the alleged misrepresentations or omissions to establish that the Defendants acted in bad faith or with an intent to defraud.[18]

### c. Due Care

■ To enjoy the business judgment rule's protection, officers and directors must act with due care. They meet this requirement if they inform themselves "of all material information reasonably available to them" prior to making a business decision. *Aronson*, 473 A.2d at 812. In assessing whether a business decision was an informed one, courts must determine whether the officers or directors acted in a "grossly negligent" manner. *See Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del.1985); *Smith*, 488 A.2d at 873; *Aronson*, 473 A.2d at 812. In fulfilling their duty to inform themselves, officers and directors are entitled to rely on the advice of financial and legal advisors, Mich.Comp. Laws Ann. § 450.1541(1) (West Supp.1988), provided they do not do so "blindly." *See Smith*, 488 A.2d at 858; *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264 (2d Cir.1986); *Edelman v. Fruehauf Corp.*, 798 F.2d 882 (6th Cir.1986).

The Plaintiffs contend that the Defendants failed reasonably to inform themselves before deciding two matters: 1) to sell the Company as a whole rather than piecemeal and 2) to accept Hoover's bid.

### (i) Selling Ferro as a Whole

The Plaintiffs argue that Ferro's directors had a duty to obtain the highest possible price when selling the Company, but that they failed to inform themselves regarding the best way to do so. According to the Plaintiffs, Offenbecher instructed Dillon Read to find a buyer for all of Ferro without first obtaining advice concerning the best method for selling the Company. The Plaintiffs also contend that Offenbecher and Smith failed to inform themselves when they opposed Peter Detwiler's and John Bryant's resolution that the board seek advice regarding "the best procedure to follow to obtain the highest possible price for the sale of the three divisions of the Corporation, either separately or together. . . ."

---

**18.** The Plaintiffs correctly contend that the business judgment rule does not apply to allegations regarding misrepresentations or omissions in a proxy statement. *See In re Anderson, Clayton Shareholders Litig.*, 519 A.2d 669, 675 (Del.Ch. 1986). Rather, the court must assess whether the officers and directors have disclosed all material information to the shareholders. *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977); *Joseph v. Shell Oil Co.*, 482 A.2d 335, 342 (Del.Ch.1984). As noted above, however, the Defendants fulfilled their obligations regarding the Proxy Statement.

■ The Plaintiffs' assertion that directors have a duty to obtain the "highest price attainable" when selling the company (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 n. 16 (Del.1986)) too narrowly interprets the directors' duty in an auction context. Responding to the argument that directors exercising due care would "never ... accept less when more is offered," Chancellor Allen recently noted:

> Plaintiff invokes the *Revlon* case in making this argument. I find it unnecessary to specifically treat that well-known case's holding here except to say that plaintiff is certainly incorrect to assert that that case recognized a duty on the part of directors when a corporation is 'for sale,' to get the highest available price. Rather, the duty can only be to try in good faith, in such a setting, to get the best available transaction for the shareholders. Directors are not insurers.

*Citron,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 93,915, at 90,102–03 n. 17 (applying the business judgment rule where the board rejected a higher-priced bid in which the offer involved preferred stock, not cash, the bidder—perhaps intentionally—had offered no specifics concerning the terms of the preferred stock, and the bid required a four-month delay before the shareholders would receive payment); *see also Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 577 (11th Cir.1988) (applying the business judgment rule where the board approved a lower-priced bid it believed was "superior in terms of timing, tax consequences and financing").

Moreover, the Plaintiffs' specific allegations concerning the Defendants' purported failure to inform themselves regarding a piecemeal sale are without merit. As noted above, the Plaintiffs offer no evidence that Offenbecher instructed Dillon Read to sell Ferro as a whole. The facts indicate that Dillon Read selected the method for selling the Company, and that that method involved approaching prospective purchasers interested in buying all or part of Ferro.

■ Similarly, Offenbecher's and Smith's role in defeating the resolution proposed by Peter Detwiler and Bryant did not deprive them of information regarding the virtues of selling Ferro's components. Immediately after voting down Peter Detwiler's and Bryant's proposed resolution, the board passed another resolution directing Touche Ross, Clark Klein, and Dillon Read to "advise the Board of the practical and price considerations to be considered by the Board in the sale of the Company's operating divisions and whether it can be carried out in a reasonable time frame." Pursuant to this directive, representatives from these firms analyzed the tax, accounting, and legal implications of selling Ferro's components and presented their findings to the board at a subsequent meeting. Based upon that information, the board decided to pursue a sale of the Company as a whole, although it did not rule out a sale of Ferro's components.

### (ii) Accepting Hoover's Bid

■ The Plaintiffs also contend that Offenbecher and Smith failed reasonably to inform themselves before accepting Hoover's bid. In particular, they assert that Offenbecher and Smith neglected to make an independent valuation of Ferro, failed to question Dillon Read regarding the factual basis for its June 5, 1985 oral fairness opinion, and opposed Peter Detwiler's and Bryant's effort to adjourn the meeting for three days so they could analyze the bids and consult with their financial advisors.

In light of their extensive knowledge of Ferro, Offenbecher and Smith had no obligation to obtain an independent valuation of the Company. In *Smith,* the Delaware Supreme Court stated:

> We do not imply that an outside valuation study is essential to support an informed business judgment.... Often insiders familiar with the business of a going concern are in a better position than are outsiders to gather relevant information; and under appropriate circumstances, such directors may be fully protected in relying in good faith upon

the valuation reports of their management.

488 A.2d at 876.

Moreover, Dillon Read's auction—including fourteen indications of value and five final bids—afforded Offenbecher and Smith ample opportunity to assess Ferro's value. Discussing the directors' duty to inform themselves of all information reasonably available, Chancellor Allen has noted:

> When the question is what is the best available price for an asset, the market for such an asset provides a valuable source, and where the relevant market is 'thick,' the most useful source of information. In the sale of a very special, perhaps unique asset such as control of a corporation, a regular market will be unavailable. In that instance, an auction market can provide important information as to what is the best available transaction for sale of the Company. Thus, in *City Capital Associates v. Interco Incorporated*, [551 A.2d 787 (Del. Ch.), *appeal dismissed*, 556 A.2d 1070 (Del.1988) ], the view was implied that when an auction sale of the Company was going forward, the board's duty to be informed would require that the auction be permitted to go forward to generate information as to what the market would offer....

*In re RJR Nabisco, Inc. Shareholders Litig.*, [Current] Fed.Sec.L.Rep. ¶ 94,194, at 91,713 (Del.Ch.1989). Offenbecher and Smith knew the valuations generated by the auction market for Ferro, in which Dillon Read approached seventy potential purchasers, received twenty-one indications of value (fourteen for the company as a whole and seven for its components), and obtained five final bids.

The Plaintiffs have criticized Dillon Read's blind auction, but courts have recognized its validity. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,071, at 91,023– 24, 1988 WL 108332 (Del.Ch.) ("It is the very nature of a blind auction that the bidders do not know the amount of the competing bids. Hence, they must 'bid

against themselves' in the sense that they have a strong inducement to offer the highest amount they are prepared to pay."), *rev'd on other grounds*, 550 A.2d 35 (Del. 1988).

The Plaintiffs also assert that Dillon Read should have contacted bidders in addition to the seventy prospective purchasers the firm approached originally. However, Dillon Read's selection of potential bidders itself involved a business decision entitled to the business judgment rule's protection. As the court in *Citron* observed:

> [I]n the world of business (as elsewhere), persons are often (or always) required to act on less than perfect or complete information. Thus, just how much information prudence requires before a decision is made is itself a question that calls for an informed judgment of the kind courts are not well-equipped to make.

[Current] Fed.Sec.L.Rep. ¶ 93,915, at 90,- 104; *see also Danaher Corp. v. Chicago Pneumatic Tool Co.*, 633 F.Supp. 1066, 1072 (S.D.N.Y.1986) ("No doubt plaintiffs can point to additional tests and studies they argue should have been conducted. Perhaps it would have been more prudent to do so. But a stockholder certainly cannot enjoin corporate transactions taken in good faith by the corporation merely on the showing that it would have been more prudent to study the matter further before acting.").

According to the Plaintiffs, Offenbecher and Smith "blindly" relied upon Dillon Read's June 5, 1985 oral fairness opinion by failing to question Dillon Read regarding the basis for its opinion. The minutes from the June 5, 1985 board meeting, however, reveal that a Dillon Read representative "reviewed each of the bids in great detail, *and was questioned at great length by members of the Board of Directors.*" June 5, 1985 Minutes at 3 (emphasis added). Moreover, *Smith v. Van Gorkom* recognized that directors knowledgeable about the corporation have no legal obligation to obtain fairness opinions by independent bankers. 488 A.2d at 876.

The Plaintiffs contend that the facts surrounding the board's decision to sell Ferro are similar to the facts in *Smith* and *Hanson*. In those cases, the courts refused to apply the business judgment rule, reasoning that the directors' failure to inform themselves prior to making the business decisions at issue amounted to grossly negligent conduct.

*Smith v. Van Gorkom* involved the Trans Union board's decision to approve and recommend to shareholders a cash-out merger. The decision to sell the company began when Jerome Van Gorkom ("Van Gorkom"), Trans Union's Chairman and Chief Executive Officer, suggested to Jay Pritzker ("Pritzker") that Trans Union conduct a $55 per share cash-out merger with a company Pritzker controlled. Pritzker and Van Gorkom met several times over the course of a week. That Thursday, Pritzker made the offer Van Gorkom had suggested, but he required that the board approve the offer by the following Sunday evening.

On Friday, Van Gorkom called a special board meeting for Saturday, without advising the directors of the meeting's purpose. When Van Gorkom informed senior management about the proposal an hour before the Saturday board meeting, all but two of the officers reacted "completely negative," but Van Gorkom proceeded with the meeting anyway.

Van Gorkom began the meeting with a twenty minute presentation describing the merger. Because the proposed agreement permitted Trans Union to receive (but not solicit) competing offers for ninety days, Van Gorkom suggested that the free market would determine whether $55 per share constituted a fair price. Van Gorkom failed to disclose that he, not Pritzker, had set the price. The company's chief financial officer stated that, although he had learned of the merger only that morning, calculations he previously had made regarding a possible LBO indicated that $55 per share was "in the range of a fair price," but "at the beginning of the range." The chief financial officer was among the managers who had opposed the merger, but he declined to reveal his opposition to the board.

The board approved the merger following a two hour discussion, without having or reviewing the merger documents and without obtaining a serious valuation of the company, either by management, the directors, or an investment banking firm. Van Gorkom executed the agreement that evening, although at the time neither he nor any director had read it. Trans Union announced the merger agreement as "definitive", without disclosing the company's right to receive other offers, and the shareholders subsequently approved the agreement.[19]

In *Hanson*, the Second Circuit enjoined a lock-up option SCM Corporation ("SCM") had granted to Merrill Lynch, one of two competing bidders for SCM. The option accorded Merrill Lynch the irrevocable right to purchase two of SCM's most attractive businesses at "significantly undervalued" prices, should a third party acquire one-third of SCM's stock.

The Court described the meeting at which SCM's board had approved the option as follows:

> [T]he SCM directors, in a three-hour late-night meeting, apparently contented themselves with their financial advisor's conclusory opinion that the option prices were "within the range of fair value," although had the directors inquired, they would have learned that Goldman Sachs [the board's investment banker] had not calculated a range of fairness. There was not even a written opinion from Goldman Sachs as to the value of the two optioned businesses.... Moreover, the feedback from the company's top officers and board members. The court apparently thought it was an abdication of duty for the other directors to submit to this kind of domineering leadership.
>
> R. Clark, *Corporate Law* 129 (1986).

---

19. According to one commentator:

> Of apparent importance to the result (on my reading) is the circumstance that Van Gorkom seems to have been a rather autocratic leader who acted and made decisions in a solitary rather than a consultative fashion, without soliciting substantial discussion with and

Board never asked what the top value was or why two businesses that generated half of SCM's income were being sold for one third of the total purchase price of the company ... or what the company would look like if the options were exercised.... There was little or no discussion of how likely it was that the option "trigger" would be pulled, or who would make that decision—Merrill, the Board, or management.

*Hanson,* 781 F.2d at 275. The Court noted that, because there was no deadline requiring quick action, the directors had "manifestly declined to use 'time available for obtaining information' that might be critical, given the 'importance of the business judgment to be made.' " *Id.* Moreover, the directors had relied on Goldman Sach's opinion without reviewing underlying documents or questioning Goldman Sachs regarding its opinion.

Courts since *Smith v. Van Gorkom* and *Hanson* have elaborated the circumstances in which directors have exercised due care in making business decisions. Noting that *Smith v. Van Gorkom* and *Hanson* constitute "the exception rather than the rule," commentators have described these circumstances as including:

a majority of outside directors or the creation of a special committee consisting solely of outside directors, consultation with financial advisors and legal counsel retained either by the board as a whole or separately by the outside directors acting as a group (but not by management acting on its own), questioning of management representatives and financial and legal advisors rather than reliance on conclusory statements by these advisors, ... meetings including only outside directors at which questions were formulated ... [,] pre-meeting distribution of relevant documentation, including summaries of the transaction to be discussed and copies of agreements to be executed, the directors' reading and careful review of such documentation, counsel's review of documentation with the directors, discussion of the proposed transaction at more than one meeting, use of the time the directors have in which to act, previous consideration of similar or related transactions, ... discussion of the proposed transaction's likely effect upon the corporation ... [,] the existence, duration and other bona fides of arms-length negotiations with third parties with whom the corporation is entering into the transaction, and the extent of outside director involvement in these negotiations.

*Block,* at 60–64 (*see also* cases cited therein).

The facts here demonstrate that the board's decision to sell Ferro is distinguishable from *Smith* and *Hanson.* Moreover, that decision involved many of the factors courts have cited when applying the business judgment rule:

1) In 1984, the Ferro board appointed a special committee of outside directors to interview the shareholders and ascertain their wishes regarding Ferro's future.

2) Throughout 1984, the Company's shareholders, directors, and management received Dillon Read's views concerning the options then available as well as possible ranges of values with respect to those alternatives.

3) A special committee retained Dillon Read in 1984 to explain the shareholders' options for obtaining liquidity and to evaluate the Company.

4) In December 1984, seventy percent of the shareholders approved a resolution authorizing management to obtain bids for the Company.

5) Ferro's board retained Dillon Read in early 1985 to sell the Company.

6) To market Ferro, Dillon Read implemented a controlled auction by which it approached more than seventy companies over a six-month period.

7) Plaintiffs retained Hutton in early 1985 to advise them concerning the sale of the Company.

8) Dillon Read met with the Ferro board on numerous occasions in 1984 and 1985 to explain its activities, recommendations, and opinions.

9) Dillon Read met with Hutton to consider Hutton's valuation and views as to marketing and projections.

10) Hutton met with the special committee to present its evaluation of Ferro and its views regarding how Ferro should be marketed.

11) The directors actively participated in the selling process, holding eight formal meetings in 1985 and numerous informal discussions at which they: reviewed the selling process employed by Dillon Read; considered procedures suggested by the Plaintiffs and Hutton; reviewed the financial projections; obtained the views of the Plaintiffs and Hutton regarding projections; suggested potential purchasers to Dillon Read; obtained the views of the Plaintiffs and Hutton regarding potential purchasers; reviewed valuation ranges provided by Dillon Read and Hutton; reviewed the indications of value submitted by prospective purchasers; and considered tax, accounting, and legal matters affecting the form of transaction.

12) Peter Detwiler on numerous occasions told the board that he believed the selling process was not designed to attain the highest price for Ferro and that he and Hutton believed that Ferro was worth at least $150 million.

13) After Ferro received the final bids, Offenbecher and the outside directors met as a special committee on June 3 and June 5 to evaluate the bids. The special committee unanimously recommended that the board accept Hoover's bid.

14) Dillon Read recommended at the June 3 and June 5 special committee meetings and the June 5 board meeting that Ferro accept Hoover's bid and orally opined that Hoover's bid was at the "high end of the fairness range." Dillon Read was questioned at great length by members of the board.

15) On June 5, 1985, the full board met for six hours to consider the bids, and seven directors—including all the outside directors—voted to accept the Hoover bid. Peter Detwiler voted against the resolution, and Bryant abstained.

16) Dillon Read provided a written fairness opinion regarding the Hoover bid, concluding that the bid was "fair from a financial point of view."

17) The shareholders met on July 25, 1985 and voted to accept Hoover's bid.

The Plaintiffs' further allegation that the Defendants neglected to inform themselves by opposing Peter Detwiler's and Bryant's attempt to postpone the board's decision regarding Hoover's bid also must fail. The facts indicate that a majority of the directors defeated this resolution after Dillon Read informed them that a delay could prompt Hoover to reduce or withdraw its bid and Offenbecher suggested that the board's prolonged involvement in the selling process provided it sufficient information to make a decision.

Courts have recognized that the directors' decision to act under time pressure does not breach their duty to inform themselves. In *Citron*, for example, the bidder advised the board it would withdraw its bid if the board failed to accept it the day of the offer. Noting that the short time the board had to consider the final alternatives was a "fact [that] deserves comment," the court said:

Here ... an arm's-length adversary imposed a time limit under the threat of losing its proposal. The board believed that risk to be real. I find that its belief in that regard was no sham or pretext for preferring a favored bidder. That belief forced the board to grapple with an important decision in a short period.... In my opinion, where a disinterested board in good faith considers the significance of the decision called for, the available information of which it and its advisors are aware and the time constraints imposed upon it, and in those circumstances, the board makes a decision that it *is* in the best interests of the corporation to act, that decision itself is

entitled to the benefits of the business judgment rule.

*Citron*, [Current] Fed.Sec.L.Rep. ¶ 93,915, at 90,103–04 (emphasis added). Similarly, *RJR Nabisco* involved a situation in which a final bidder had given the board thirty minutes to make a decision. Finding that the board did not act in bad faith by accepting that bid, the court said:

> Of course, this may have been an empty threat. I suppose that few thought the chances of such a withdrawal very high but no one, of course, was in a position to assure that it would not happen. Were it to have happened, it is plain that the recap option would have provided a poor substitute at the range of values the bidding had been driven to.
>
> \* \* \* \* \* \*
>
> In the light of these circumstances, the decision not to attempt to break the tie but to accept one of the bids at that point and thus avoid the risk of the loss of that bid—no matter what my personal view might be that the risk was rather small—can in no event be seen as justifying an inference that those who made such a choice must have had some motivation other than the honest pursuit of the corporation's welfare.

*RJR Nabisco*, [Current] Fed.Sec.L.Rep. ¶ 94,194, at 91,712–13.

In light of Dillon Read's concern that delay would prompt Hoover to withdraw the bid and the substantial information available to the board, the board did not breach its duty to inform itself by defeating Peter Detwiler's and Bryant's resolution to adjourn.

#### 4. Overcoming the Business Judgment Rule's Presumption

█ Noting that the business judgment rule is a presumption only, the Plaintiffs contend that the court should deny summary judgment to allow them "to rebut this presumption at trial with evidence of the defendants' grossly unadvised business decisions." Plaintiffs' Mem. at 75.

If the business judgment rule applies, courts "should decline to review the wisdom and merits of a business decision." *Mills Acquisition Co. v. Macmillan, Inc.*,

559 A.2d 1261, 1279 (Del.1989). As the Delaware Supreme Court has noted: "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision 'can be attributed to any rational business purpose.'" *Unocol*, 493 A.2d at 955 (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971)).

The Plaintiffs cite no case in which a party overcame the business judgment rule's protection where the sale of a company involved a special committee of outside directors, an investment banker, special counsel, an accounting firm, board meetings over eighteen months, and shareholder approval. Under the facts described above, no reasonable jury could find that the Defendants' conduct in the sale of Ferro involved no "rational business purpose." *Id.* Accordingly, the state fiduciary law claims are dismissed.

#### Conclusion

For the reasons set forth above, the Defendants' motion for summary judgment is granted, and the complaint is dismissed in its entirety. Enter judgment with costs on notice.

It is so ordered.